FILED

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## ALEXANDRIA DIVISION

2016 JUL 15  P 4: 05

CLERK US DISTRICT COURT
ALEXANDRIA, VIRGINIA

**PATRIOT GROUP INTERNATIONAL, INC.**

Plaintiff,

v.

**JANUS GLOBAL OPERATIONS LLC,
f/k/a STERLING GLOBAL OPERATIONS,
INC., f/k/a EOD TECHNOLOGY, INC.**

Defendant.

Civil Action Number: 1:16-CV-907
(LMB/ TCB)

## COMPLAINT

Plaintiff, Patriot Group International, Inc. ("PGI" or "Plaintiff"), by and through undersigned counsel, brings this Complaint against Defendant Janus Global Operations LLC ("Janus" or "Defendant"), f/k/a Sterling Global Operations, Inc., f/k/a/ EOD Technology, Inc. for: (1) breach of contract; (2) misuse and misappropriation of trade secrets pursuant to the Defend Trade Secrets Act of 2016 ("DTSA"), 18 U.S.C. § 1836; (3) misuse and misappropriation of trade secrets pursuant to the Virginia Uniform Trade Secrets Act ("VUTSA"), Va. Code. 59.1-336; (4) fraud; (5) statutory conspiracy pursuant to the Virginia Business Conspiracy Act ("VBCA"), Va. Code § 18.2-499; (6) attempted statutory conspiracy pursuant to the VBCA; (7) common law conspiracy; and (8) tortious interference with contractual relations. In support of these claims, PGI alleges the following:

1

## THE PARTIES

1.      PGI is a North Carolina corporation with its principal place of business in Warrenton, Virginia.

2.      Janus is a Delaware corporation with its principal place of business in Lenoir City, Tennessee.

3.      PGI has a Master Subcontract Agreement ("MSA") with EOD Technology, Inc., now Janus Global Operations, LLC ("Janus") under the terms of which PGI, as the Prime Contractor ("Prime") would retain Janus to perform certain professional services as a subcontractor in furtherance of the performance of a contract ("the Project") with the U.S. Government[1] ("USG Client").

## JURISDICTION AND VENUE

4.      This court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332. The parties are citizens of different states and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

5.      This court also has subject matter jurisdiction pursuant to the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836.

6.      This court has personal jurisdiction over the Parties, and the venue is proper pursuant to paragraph 15 of the MSA between the Parties. (A redacted copy of the MSA is attached as **Exhibit A**).

---

[1] The contract with the USG Client involves sensitive national security matters. As such, Plaintiff may have to redact certain materials (and has not filed Exhibit A to the MSA, which is the "Statement of Work" provided by the USG Client) and may refer to certain individuals anonymously. Subject to appropriate security measures, and the approval of the USG Client, Plaintiff will provide unredacted copies to the Court under seal and/or for the Court's *in camera* review.

## FACTUAL BACKGROUND

### *Contracts and Agreements Between PGI and Janus*

7.      On or about August 1, 2012, PGI and EOD Technology, Inc., now Janus[2], entered into the MSA under the terms of which PGI, as the Prime would retain Janus to perform certain professional services as a subcontractor in furtherance of the performance of the Project with the U.S. Government.

8.      Paragraph 1 of the MSA, provides, in relevant part, that Janus' "authorization to proceed with work shall be specifically provided for in Purchase Order(s) issued under this Agreement and executed by authorized representatives of the Parties."

9.      Paragraph 1 of the MSA, further provides, in relevant part, the following:

EODT shall immediately respond to any request made by PGI to correct any defect, material or otherwise; problem; alleged breach; schedule of the Work; or contract/performance requirement issue; and thereafter, take immediate steps to take corrective action. Failure by EODT to immediately respond to a request to take corrective action and/or immediately take corrective action may result in Termination, with or without cause, of this Agreement or any applicable Purchase Order.

10.      Paragraph 9 of the MSA, provides, in relevant part, the following:

**INDEMNIFICATION**
The Parties, which for the purposes of this section shall mean PGI and EODT and their employees, hires, consultants, subcontractors, vendors, suppliers, subsidiaries, and affiliates, shall defend, indemnify and hold harmless the other Party and the Client and each of their agents, officers and employees, from any and all claims and damages, causes of action, costs, expenses, reasonable attorney's fees, losses or liability, in law or in equity, of every nature or character whatsoever ("Claims") arising from or related to performance of this Agreement or any Purchase Order including, but not limited to:
...

---

[2] The original MSA was between PGI and EODT. For a number of reasons, some of which will be further explored in discovery, EODT has changed its name and corporate structure twice during the term of the MSA. This Complaint refers to "EODT" when quoting directly from the MSA, but otherwise uses the contracting party's current name.

g.   any obligation to PGI's Client resulting from the Party's breach of an obligation hereunder; . . .

11.   Paragraph 11 of the MSA, provides, in relevant part, the following grounds for termination for cause by PGI:

Reasons for Termination for Cause shall include, without limitation:

a.   failure by EODT at any time to provide the necessary labor, materials, supplies, equipment, or supervision for the proper performance of the Work;

b.   failure to correct any material defect and/or repeated failure to correct any other defect(s) which it is obligated to correct after being notified by PGI to correct;

c.   substantial failure to comply with any one or more of EODT's material obligations under this Agreement or Purchase Order including the obligation to provide data, reports, information, or documents required to be provided and/or requested by PGI;

. . .

e.   failure to make timely payment to subcontractors or suppliers;

f.   failure to maintain proper quality control procedures and required licensing and certification;

. . .

i.   for breach of nondisclosure or misrepresentation of any relevant facts required to be disclosed concerning a conflict of interest or potential conflict of interest under this Agreement.

12.   Paragraph 11 of the MSA, further provides:

After receipt of any type of Termination action by PGI, EODT, except as otherwise required by PGI, shall deliver to PGI all data, drawings, specifications, reports, summaries, and such other information and materials as may have been prepared by EODT or received from PGI in the performance of the Work, whether completed or in process.

13.   Paragraph 13 of the MSA states the following:

**CONFIDENTIALITY**
During the performance of the Work, and for two (2) years after completion, each Party, unless otherwise agreed to in writing by the other Party, shall not release information regarding the Work or terms of this Agreement, Purchase Order, modifications (including all exhibits, attachments, reports, financial information associated with these documents and this program), and Client supplied documentation to any person other than the disclosing Party's authorized representative solely for purposes of carrying out such Party's obligations under this Agreement, except (i) for information that is in the public domain through no

fault of the disclosing Party, and (ii) to the extent such release is required by law. EODT agrees to hold in confidence all confidential information relating to this Client. Confidential information shall not be disclosed to anyone other than the Client and those specifically cleared by the Client to perform under this contract.

14.     Paragraph 18 of the MSA states the following:

**OWNERSHIP OF DOCUMENTS, PATENTS AND COPYRIGHTS**
Unless otherwise specified in the Purchase Order(s), the Work and all records relating to it developed for PGI or PGI's Client in the performance of the Agreement, including, without limitation, all drawings, specifications, reports, summaries, samples, photographs, notes, calculations and other documents shall be deemed the property of PGI or PGI's Client. Upon termination or expiration of this agreement, EODT agrees to immediately return to PGI all documents or other materials deemed the property of PGI or PGI's Client.
If EODT or its personnel produce any inventions or prepare copyrightable material as a result of the performance of this Agreement, EODT retains ownership thereof, but agrees to (1) promptly disclose such inventions or materials to PGI, and (2) with regard to same, grant to PGI and PGI's Client an irrevocable, nonexclusive, royalty-free worldwide license, and the irrevocable right to grant nonexclusive, royalty-free licenses to their affiliates without accounting to EODT, to use same.

15.     Paragraph 19 of the MSA states the following:

**CONTACT WITH PGI'S CLIENT**
In certain situations, EODT may, and only if required in performance of the Work, have dealings with PGI's Client. Otherwise, EODT is prohibited from contacting PGI's Client for matters dealing with the Scope of Work or Compensation.  If PGI's Client initiates contact with EODT or requests information or services from EODT not in accordance with the Work, EODT shall immediately report said contact and requests to PGI.

16.     Paragraph 20 of the MSA, provides, in relevant part, the following:

**PROCUREMENT INTEGRITY AND ETHICS**
EODT, in its dealing with PGI any other lower-tier subcontractor, and in any other matter relating to or arising out of the Work agrees to abide by all Federal Acquisition Regulation (FAR including the DFAR and DOSAR) provisions regarding Procurement Integrity (FAR 3.104), Code of Business Ethics and Conduct (FAR 3.1004), and Combating Trafficking in Persons (FAR 22.1700), the Procurement Integrity Act, Truth in Negotiations Act, the Foreign Corrupt Practices Act of 1977 (Public Law 95-213), as amended, and any other similar and applicable law for the country in which the Work is performed. Prohibited actions under this Agreement include but are not limited to bribery; kick-backs; gratuities; personal relationships and other conflicts of interests with government

and/or contracting officials might provide EODT a knowing advantage; providing fraudulent or defective cost and pricing data; or the appearance of impropriety with regard to any of the foregoing.

17.     Paragraph 22 of the MSA, which prohibits the Parties from hiring one another's employees, provides the following:

**HIRING OF EMPLOYEES**
The Parties agree that during the term of this Agreement, and any Purchase Order(s) still in performance, and for a period of one (1) year thereafter that they will not hire either directly or indirectly any employee of the other Party, except as provided in Article 11 of this Agreement.   This clause applies to any subsidiary, affiliate, or other entity owned or controlled by the Party. Further, the term "hire" as used in this paragraph includes any terms of financial, material, or like remuneration, monetary or otherwise offered to the Party's employee.

18.     In furtherance of the Project, PGI issued three Purchase Orders to Janus under and in accordance with the MSA, which Janus signed and agreed to. Redacted copies of Purchase Orders under the Project are attached hereto as **Exhibit B.**

19.     Section 1.2 of each Purchase Order ("PO") provides, in relevant part, that "Subcontractor shall furnish the necessary services of skilled professional personnel in support of the requirements described in the Statement of Work (SOW)..."

20.     Section 1.7 of each PO provides, in relevant part:

**Program Management/Notification of Changes**
Only the designated Business Manager for PGI may approve changes in any of the requirements under the Subcontract.  Any change made at the direction of any other individual will be considered to have been made without the authority and will warrant no adjustment to this Subcontract.

21.     Section 1.8 of each PO provides, in relevant part:

**Client Contacts**
Only the Prime Contractor can authorize additional tasks and change the scope of work.

All reports, memoranda, or any other written material developed by the Subcontractor during the performance of the effort herein for the Client, must be submitted through and with the written approval of the Business Manager.  Where

appropriate, the Subcontractor will be identified as having been the originator of such work. This provision is not intended to discourage or prohibit informal technical discourse between Subcontractor personnel and the Client.

22.     Section 1.10 of each PO provides, in relevant part:

**Security Classification and Clearances**
The Work to be performed hereunder involves classified information necessitating performance by personnel with appropriate security clearances. A Contract Security Classification Specification (DD254) is applicable.

### *Summary of Events*

23.     On or about February or March, 2014, one or more Janus employees submitted timesheets and hotel expenses for work that never took place. This conduct constitutes a material breach of the MSA.

24.     During the months of April and May 2014, Janus employees repeatedly used PGI vehicles for personal use. PGI investigated the issue and made sure that its USG Client was not charged. This conduct constitutes a material breach of the MSA.

25.     On or about March 1, 2016, Janus failed to pay independent contractors working on the project. This failure constitutes a material breach of the MSA.

26.     From March 1 – 30, 2015, Janus failed to staff the Training Manager position. This position, which is Janus' responsibility to staff, went unstaffed again from October 2, 2015 to January 4, 2016 following the removal of Janus' Training Manager for cause. Janus failed to staff the Training Supervisor position beginning March 16, 2015 through January 31, 2016. The position was not funded in the next Option Year as a result. Pursuant to the terms of the MSA and subsequent Purchase Orders, this failure constitutes a material breach of the MSA and resulted in PGI receiving an "unsatisfactory" review from the USG Client.

27.     In or about February or March of 2015, Janus sent a formal letter to the USG client requesting increases to the labor rates on the Project. This request was not run through the

Business Manager, and the Business Manager was not notified of the request until weeks after it was made. This improper contact by Janus constitutes a material breach of the MSA.

28.     Janus' actions ultimately reflected negatively on PGI as the Prime, have irreparably damaged PGI's relationship with the USG Client, and resulted in PGI receiving an unsatisfactory performance rating from the USG Client.

29.     At one point, a USG representative with supervisory authority over the Project asked a PGI employee if he thought Janus was trying to "sabotage" PGI and/or the Project.

30.     That unsatisfactory performance rating, in turn, resulted in the USG Client eliminating PGI's remaining award term on the Project, and a loss to PGI in excess of $74.2 Million in revenue.

31.     Past performance is a fundamental metric in evaluating bidders for government contracts. Janus' actions are the proximate cause of PGI's recent unsatisfactory performance rating, have tarnished PGI's professional reputation as a federal contractor, and will negatively impact PGI's ability to secure other government contracts for years to come.

32.     Per FAR 52.215-19 (Ownership Change), which is incorporated into the MSA, Janus is required to provide ownership change information:

(a) The Contractor shall make the following notifications in writing:

(1)  When the Contractor becomes aware that a change in its ownership has occurred, or is certain to occur, that could result in changes in the valuation of its capitalized assets in the accounting records, the Contractor shall notify the Administrative Contracting Officer (ACO) within 30 days.

(2)  The Contractor shall also notify the ACO within 30 days whenever changes to asset valuations or any other cost changes have occurred or are certain to occur as a result of a change in ownership.

33.     On February 15, 2013, PGI was notified by the client that it was in non-compliance with the facility security requirements of the Project based on the fact that Janus did not have an active facility clearance in its current company name.   Prior to receiving the letter of concern from the customer, PGI had not been notified by Janus of the name change (from EODT to Sterling), which apparently occurred in October of 2012.

34.     On February 20, 2013, PGI submitted a letter to Janus to notify it of the client's concern. Janus' failure to adhere to this FAR requirement resulted in PGI receiving a letter of concern and has negatively impacted the customer's view of PGI's performance.

35.     On or about April 12, 2016, Defendant changed its name and corporate structure from Sterling Global Operations, Inc. to Janus Global Operations, Inc., (once again) without timely informing PGI of the intended change.

36.     Shortly thereafter, having noticed the name change on Janus/Sterling/EODT employees e-mail signatures, PGI asked a Janus employee during a program status meeting/teleconference if there was a change and that Janus employee confirmed that Sterling had changed its name to Janus.

37.     PGI then requested that Janus provide the specific information regarding this change and, on April 26, 2016, PGI submitted a letter to the client, notifying them of Sterling's name change to Janus.

38.     Janus, thus for a second time, failed to adhere to the FAR requirement incorporated in the MSA to properly notify PGI of a name change.

39.     In or about February and March of 2016, Janus awarded false "Certificates of Training" to contractors working on the Project for a number of training courses. A simple calculation of the time that would be required to complete these training courses compared with

the *actual time spent in training* betrays the fact that these "Certificates of Training," which were issued by "Sterling Global Operations, Inc." and were signed by Randy Leonard ("Leonard"), a Janus Employee who is the Training Manger on the Project, were fraudulent.

40.     In or about April of 2016, Beach notified Janus that Janus' purchase of approximately $143,000 of equipment was unauthorized, was made without her approval (in violation of the terms of the MSA), and there was insufficient funding on the contract to cover the costs. This was an issue because, per the terms of the MSA, any such purchases were to be approved by PGI first – a necessary safeguard to ensure that there would be sufficient funding for such purchases. In fact, there was not sufficient funding to make this unauthorized purchase.

41.     Following this notification, the USG Client notified PGI that the cost of the unauthorized purchase that exceeded the budget would not be approved.

42.     In or about April of 2016, Christopher Toy ("Toy"), Janus' Director of Risk Management Programs, responded to Beach's concerns unapologetically by stating, *inter alia*:

> With regard to the notification issue that you have mentioned, [Janus] is in possession of an email from the USG Client approving [REDACTED] purchases to be executed without approval, at the discretion of Randy Leonard to ensure training take place without interruption.  Moreover, we have never received written guidance from PGI stating that PGI disagreed with the USG Client's guidance and required us to notify PGI prior to [REDACTED] purchasing.

43.     On or about April 22, 2016, Greg Craddock ("Craddock"), CEO of PGI, emailed Alan Weakley ("Weakley"), President and COO of Janus.  In that email, Craddock requested a meeting with Weakley to address Janus' unauthorized equipment procurement and the working relationship between PGI and Janus.

44.     On or about April 22, 2016, Weakley responded to Craddock's April 22, 2016 e-mail, stating, in relevant part: "Thank you for reaching out and letting me know of your concerns. I appreciate your valuing the relationship with Janus and I can assure I value our

partnership with PGI as well. It's from that basis that we will work together to resolve the issues you have presented and address all concerns."

45.     On or about May 3, 2016, Weakley met with, *inter alia,* Craddock, Beach, Robert Whitfield, COO of PGI, Jesse Sanders, VP of PGI, and Matt Hulsey ("Hulsey"), VP of Janus. PGI's purpose for the meeting was to follow up on the concerns raised by Craddock in his April 22, 2016 e-mail to Weakley and to determine if Janus was interested in continuing to work with PGI as a partner on the Project, or if Janus intended to proceed as a competitor.

46.     In that May 3, 2016 meeting, Weakley apologized for Toy's behavior and re-affirmed that Toy would no longer be involved in the Project.

47.     In that May 3, 2016 meeting, the PGI staff and officers present addressed a number of concerns regarding Janus' infractions of the MSA, including, but not limited to: the unauthorized purchase of equipment by Janus; Leonard's deliberate, repeated, and improper circumvention of PGI in his dealing with the USG Client; lack of adequate communication from Janus; lack of adequate invoice support by Janus; Janus' failure to staff certain positions (and the resultant harm to PGI's reputation with the USG Client); the staffing of a key position on the Project by Janus without the required qualifications (and the resultant harm to PGI's reputation with the USG Client); the removal of two Janus employees, for cause, from the Project (and the resultant harm to PGI's reputation with the USG Client); and the repeated (and unannounced) name changes by Janus (and the issues those name changes have caused with the USG Client).

48.     In that May 3, 2016 meeting, Hulsey agreed that these were serious issues and committed to fixing these issues immediately. These assertions have proven to be false. As such, Janus remains in material breach of the MSA.

49.     Throughout that May 3, 2016 meeting, Weakley and Hulsey repeatedly stated that Janus was PGI's "trusted partner" and that Janus would not be competing against PGI in any future re-compete of the Project.

50.     The May 3, 2016 meeting ended with handshakes and formalities all around, and with the agreement between PGI and Janus that they would work together on the potential re-compete of the Project and the further agreement that Janus would promptly correct the issues addressed during the meeting.

51.     On or about May 24, 2016, Leonard attended a meeting with PGI employees, independent contractors hired by PGI, and other Janus employees. Lee Gibson ("Gibson"), the Project Manager and PGI employee, also attended the meeting. During the meeting, Leonard announced that there was no way that PGI will win the Project when the contract goes up for rebid.

52.     During that same May 24, 2016 meeting, Leonard drew a timeline on the whiteboard outlining how and why PGI was going to lose the Project, and how Janus would win it. Leonard stated that USG representatives involved with the Project provided him with this information and informed him that there would be a transition period wherein the contractors would be replaced in phases to prevent them from banding together. This communication between Leonard and PGI's USG Client is in direct violation of Paragraph 19 of the MSA.

53.     During that same May 24, 2016 meeting, Leonard told those in attendance that Janus was going to start running training sessions concurrently with Project training sessions so that Janus could build up their numbers in an effort to bid on the Project. Leonard invited those attending the meeting to join the Janus training sessions.

54.     Pursuant to the terms of the MSA, Leonard and other Janus employees have intimate knowledge of the training plan developed for the Project by PGI. On a number of occasions, Leonard told Gibson that he sent that training plan, and revisions thereto, directly to USG representatives involved with the Project so that the requirements and methodologies included therein could be incorporated into the Request for Proposal ("RFP") that the USG Client would use for rebidding the Project. Such communications by Leonard directly to the USG Client are in direct violation of the terms of the MSA.

55.     Leonard admitted on a number of occasions that he had discussions with USG representatives involved with the Project in which those representatives informed Leonard that demonstrating the training would be a part of the bidding process, thus giving Janus an unfair competitive advantage over PGI, and any other bidders on the Project, because Janus is the only company (other than PGI) with knowledge of the advanced training methods currently used by PGI. Such communications by Leonard directly to the USG Client are in direct violation of the terms of the MSA.

56.     Leonard corresponded directly with PGI's USG Client, submitting a new training plan and pricing proposals for the Project that would increase costs and make it harder for PGI to perform the Project. PGI's Business Manager was not notified prior to Janus sending these materials, nor did Janus receive authorization pursuant to the MSA to communicate directly with PGI's USG Client. As a result of this unauthorized communication, PGI was obliged to adhere to the new training plan and pricing proposals that Janus submitted, thus making the Project less profitable and harder for PGI to complete. Such communications by Leonard directly to the USG Client are in direct violation of the terms of the MSA.

57.     In or about May of 2016, Leonard approached Kenneth Masters ("Masters"), a PGI employee who is the Operations Coordinator of the Project, and as such is integral to the success of the Project.

58.     In that May 2016 conversation, Leonard informed Masters that the Project was going up for re-bid, and that there was no way that PGI was going to win the re-bid.

59.     During that May 2016 conversation, and/or in additional conversations thereafter, Leonard stated that Masters was extremely valuable to the Project, and that Janus would hire Masters to do the same job when Janus is awarded the Project. Masters viewed these statements as an effort by Leonard to recruit him to work for Janus.

60.     During that conversation, and/or in additional conversations thereafter, Leonard stated that the Project would "fail" if Masters quit, and intimated that it would be the best way to ensure that PGI did not win the re-bid of the Project.

61.     On or about May 26, 2016, Leonard told Gibson that Janus was actively recruiting Masters. After hearing this from Leonard, Gibson talked to Masters about his interactions with Leonard.  Masters informed Gibson that Leonard had spoken to Masters about working for Janus, and that Leonard had asked Masters for his personal email address. Again, Leonard's efforts to recruit a PGI employee are a direct and material violation of the MSA by Janus.

62.     In or about June of 2016, Leonard again asked Masters for his personal e-mail address, which Masters provided to him.

63.     In or about June 2016, one of the contractors working on the Project approached Gibson with concerns that Janus had given him certificates for trainings that he had not completed. Not only do the certificates falsely indicate that Janus conducted specialized trainings that never took place, the total hours of the combined trainings as indicated on the certificates are

well beyond the time spent in the actual trainings that took place. In speaking with numerous members of the PGI corporate management team, Gibson learned that these fictitious certifications were never authorized by PGI.

64. In or about the June 3-7, 2016 time period, Leonard was with Gibson at the training office. At that time, Leonard asked Gibson if he would be comfortable with Leonard getting letters of intent from the contractors working on the Project saying that they would work for Janus when the Project goes up for rebid. Gibson told Leonard that he was not comfortable with that.

65. In June 2016, Leonard told Gibson to keep Greg Craddock, CEO of PGI, and Christy Beach, PGI VP of Contracts and Business Manager of the Project, out of the loop on communications regarding the Project. Again, these statements by Leonard are admissions of direct and material violations of the MSA by Janus.

66. On or about July 1, 2016, Leonard called Gibson and stated that a USG representative involved with the Project informed Leonard that he (the USG representative) is waiting for Leonard to provide the USG Client with a copy of an updated training plan so the USG Client can use that updated training plan to draft the RFP. This is yet another admission of direct and material violations of the MSA by Janus.

67. In that same July 1, 2016 telephone conversation, Leonard informed Gibson that, depending on the requirements that are ultimately written into the RFP, Janus would like to propose Gibson as Program Manager in their bid for the Project. Again, these statements by Leonard are admissions of direct and material violations of the MSA by Janus.

68.    In that same July 1, 2016 conversation, Leonard requested that Gibson provide him with sensitive and confidential PGI pricing and compensation information. Again, these statements by Leonard are admissions of direct and material violations of the MSA by Janus.

69.    In that same July 1, 2016 conversation, Leonard informed Gibson that the RFP would probably come out between July 15, 2016, and August 15, 2016.

70.    In that same July 1, 2016 conversation, Leonard told Gibson that there was going to be a requirement for a Professional Project Manager with a certain number of years experience running a program with a annual budget of at least $25,000,000. Leonard stated that he received this information from a USG representative with supervisory authority over the Project. Again, these statements by Leonard are admissions of direct and material violations of the MSA by Janus.

71.    On or about June 28, 2016, Leonard sent Masters a "test" e-mail from his personal e-mail address to Masters' personal e-mail address.

72.    On or about June 30, 2016, Leonard sent Masters an e-mail from his personal e-mail address to Masters' personal e-mail address stating the following:

Kenny,

Close hold between us please. Send me all recruiting documentation that we currently use (all letters / questionnaire etc...)

Thanks man

73.    Leonard's use of the term "close hold between us please" meant that he did not want Masters to disclose his request to anyone else. Leonard wanted Masters to keep it secret. That fact, combined with the fact that he wanted to arrange the transfer of confidential PGI

recruiting documents to his personal e-mail led Masters to believe that this request was being made for an improper purpose.

74.     On or about July 8, 2016, Leonard called Masters and asked why he had not sent Leonard PGI's recruiting documentation yet. Leonard stated that he wanted Masters to send him the documents as Microsoft Word documents, not as .pdfs.

75.     There is no legitimate business reason for Masters to send these confidential PGI documents, especially in a readily editable form, to Leonard at his personal e-mail address.

76.     On or about July 8, 2016 Gibson had a telephone call with Leonard in which Leonard again recruited Gibson to work for Janus on the Project.

77.     During that July 8, 2016 call, Leonard repeatedly said that Gibson will "have to make a choice" between PGI and Janus.

78.     During that July 8, 2016 call, Leonard assured Gibson that if Janus is awarded the Project, Janus would hire Gibson as Program Manager ("PM") or Deputy Program Manager ("DPM"). Leonard had made similar solicitations to Gibson in the past.

79.     During that July 8, 2016 call, Leonard informed Gibson that Janus is in negotiations with Osen-Hunter Group, LLC ("Osen-Hunter") to enter into a teaming agreement to bid on the Project.

80.     During that July 8, 2016 call, Leonard said that Janus' plan was to have Osen-Hunter, not Janus, hire Masters to work on the project in order to evade Janus' non-solicitation obligations to PGI.

81.     During that July 8, 2016 call, Leonard repeatedly made representations that he was receiving inside information from USG representatives involved with the Project about the USG Client's plan to issue a RFP.

82.     During that July 8, 2016 call, Leonard again requested that Gibson provide Janus with information regarding PGI's current pricing information and pay rates.

83.     During that July 8, 2016 call, Gibson expressed concerns to Leonard about his requests for the confidential pricing and pay information and asked if it was "shady" to provide him that information.

84.     During that July 8, 2016 call, Leonard responded to this question by saying that "It would be shady if I did not know for certain that I was getting the program" and that "it's really not" shady to give Janus the pricing information in the current situation.

85.     On or about July 8, 2016, Leonard stated to Gibson that he might disclose sensitive PGI pricing information to PGI's competitors.

86.     On or about July 12, 2016, Gibson and Leonard had a conversation with a USG representative with supervisory authority over the Project.  In that conversation, the USG Representative explained to Gibson that if he "resigned tomorrow" from PGI and converted to a 1099, Gibson could evade his non-compete agreement with PGI and continue working on the Project after PGI lost the contract for the Project.

87.     In that same July 12, 2016 conversation, that same USG representative with supervisory authority over the Project stated that, while it was "possible" that PGI could win the re-bid of the contract (an assertion that brought uproarious laughter from Leonard), "It would be like me kicking [professional UFC fighter] Brock Lesnar's ass." (translation – virtually impossible) After saying that, the USG representative with supervisory authority over the Project said "do not say that to [PGI CEO Greg] Craddock."

88.     On or about July 12, 2016, Gibson and Leonard had a conversation with a USG representative with supervisory authority over the Project.  In that conversation, the USG

Representative and/or Leonard used a number of racial epithets when referring to a group of African-American government contractors.

89.     On or about July 14, 2016, Leonard sent another e-mail to Masters (again from Leonard's personal e-mail address to Masters' personal e-mail address) stating the following:

> Hey man please send me the following
> 1. All recruiting letters and candidate questionnaire in word format
> 2. updated contact list for program members.
>
> Thanks

90.     On July 15, 2016, PGI terminated Janus for cause under the terms of the MSA. PGI's termination for cause of Janus was justified under, *inter alia,* Paragraph 11, Sections a, b, c, e, f, and i of the MSA.

## COUNT I
## BREACH OF CONTRACT

91.     Plaintiff incorporates by reference, as if fully set forth herein, the allegations of paragraphs 1 through 90 above.

92.     By virtue of the foregoing conduct, Janus has directly and materially violated both the MSA, and the Purchase Orders issued under the MSA.

93.     Janus materially breached its contractual obligations specified in paragraph 1 of the MSA, and paragraph 1.7 of the Purchase Orders issued under and in accordance with the MSA, by failing to have certain actions (including, *inter alia*, the purchase of equipment) authorized or executed by "authorized representatives of the Parties" (e.g. the "designated Business Manager").

94.     Janus materially breached its contractual obligations specified in paragraph 1 of the MSA, by failing to "immediately respond to any request made by PGI to correct any defect,

material or otherwise; problem; alleged breach; schedule of the Work; or contract/performance requirement issue."

95.    Janus materially breached its contractual obligations specified in paragraph 11(a) of the MSA, and paragraph 1.2 of the Purchase Orders issued under and in accordance with the MSA, as Janus failed, *inter alia,* to properly staff and supervise a number of key positions for which it was responsible on the Project.

96.    Janus materially breached its contractual obligations specified in paragraph 11(b) of the MSA, as Janus failed, *inter alia,* to correct material defects brought to its attention by PGI, including those material defects discussed in the May 4, 2016 meeting.

97.    Janus materially breached its contractual obligations specified in paragraph 11(c) of the MSA, as Janus failed, *inter alia,* to provide PGI with timely reporting and copies of key documents.

98.    Janus materially breached its contractual obligations specified in paragraph 11(e) of the MSA, as Janus failed, *inter alia,* to make timely payment to its subcontractors as recently as March, 2016.

99.    Janus materially breached its contractual obligations specified in paragraph 11(f) of the MSA, as Janus failed, *inter alia,* to maintain proper quality control procedures and required licensing and certification (and in fact issued false certifications).

100.   Janus materially breached its contractual obligations specified in paragraph 11(i) of the MSA, as Janus repeatedly breached the nondisclosure agreements between PGI and Janus and failed to disclose and/or misrepresented relevant facts that Janus was required to disclose regarding a conflict of interest or potential conflict of interest under the MSA.

101.    Janus materially breached its contractual obligations specified in paragraph 13 of the MSA, which prohibit Janus from releasing PGI's confidential information to anyone other than PGI. On a number of occasions, Janus employees have released PGI information to PGI's USG Client and/or PGI's competitor(s) without prior authorization.

102.    On or about July 8, 2016, Leonard stated to Gibson that he might disclose sensitive PGI pricing information to PGI's competitors.

103.    Plaintiff is informed and believes that Janus has plans to further use PGI's confidential information in an effort to win the Project when the contract goes up for rebid.

104.    Janus repeatedly and materially breached its contractual obligations specified in paragraph 19 of the MSA, and paragraph 1.8 of the Purchase Orders issued under and in accordance with the MSA, which prohibit Janus from communicating with PGI's USG Client without prior authorization from PGI, and require Janus to notify PGI if PGI's USG Client initiates any communication with Janus.

105.    Janus materially breached its contractual obligations specified in paragraph 20 of the MSA, by acting in a manner that may be in violation of federal laws and regulations, including, but not limited to, the Federal Acquisition Regulation (FAR including the DFAR and DOSAR) provisions regarding Procurement Integrity (FAR 3.104), Code of Business Ethics and Conduct (FAR 3.1004), and/or the Procurement Integrity Act.

106.    By way of example, but not exclusion, Janus employees engaged in improper personal relationships with government and/or contracting officials that likely provided Janus an improper and unfair competitive advantage.

107.    Janus materially breached its contractual obligations specified in paragraph 22 of the MSA, which prohibits Janus from hiring PGI employees during the term of the MSA and for

1 year thereafter, by making numerous and repeated overtures to a number of crucial PGI employees working on the Project, including, but not limited to, Gibson and Masters.

108. Janus materially breached its contractual obligations specified in paragraph 1.8 of the Purchase Orders issued under and in accordance with the MSA in that, *inter alia:* Janus employees had repeated (both overt and hidden) contact with the USG Client; improperly attempted to authorize additional tasks and change the scope of work; and submitted reports, memoranda, and other written material directly to the USG Client instead of submitting them through and with the written approval of the Business Manager.

109. Janus materially breached its contractual obligations specified in paragraph 1.10 of the Purchase Orders issued under and in accordance with the MSA, by failing to maintain and update its security classifications and clearances – a problem exacerbated by Janus' serial and undisclosed name changes.

110. As a result of the foregoing, PGI has suffered, and will imminently suffer irreparable harm and loss. Accordingly, PGI is entitled to money damages, in an amount to be determined at trial, as well as preliminary and permanent injunctive relief to prevent further material breaches of the MSA, as well as attorneys fees and costs as provided for in paragraph 26 of the MSA.

## COUNT II
## MISUSE AND MISAPPROPRIATION OF TRADE SECRETS
### Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836

111. Plaintiff incorporates by reference, as if fully set forth herein, the allegations of paragraphs 1 through 110 above.

112. By virtue of their work on the Project pursuant to the MSA, Leonard and other Janus employees have direct and intimate knowledge of PGI's trade secrets including, but not

limited to: the training plan developed for the Project by PGI, pricing documentation, recruiting documentation, and other confidential information from which PGI derives independent economic value from not being generally known or readily ascertainable by proper means by other persons who can obtain economic value from their disclosure or use.

113.   The confidential trade secret information obtained by Janus is related to PGI products and services used in or intended for use in interstate or foreign commerce.

114.   PGI has taken reasonable efforts to ensure that its trade secrets remain secret, such as including a Confidentiality clause (paragraph 13) in the MSA between PGI and Janus.

115.   PGI is informed and believes that Janus has used and/or intends to use PGI's trade secrets in an effort to gain an unfair competitive advantage over PGI and win the Project when the contract goes up for rebid.

116.   PGI is informed and believes that Janus has used PGI trade secrets in communication with PGI's USG Client in an effort to undermine PGI and weaken the relationship between PGI and its USG Client.

117.   PGI is informed and believes that Janus has shared and/or intends to share PGI's trade secrets with PGI's competitors.

118.   Janus is fully aware that it is required under the terms of the MSA to maintain the secrecy of PGI's trade secrets.

119.   As a result of the foregoing, PGI has suffered and will imminently suffer irreparable harm and loss. Accordingly, PGI is entitled to preliminary and permanent injunctive relief, civil seizure, compensatory and punitive damages in an amount to be determined at trial, attorneys fees and costs.

## COUNT III
## MISUSE AND MISAPPROPRIATION OF TRADE SECRETS
### Virginia Uniform Trade Secrets Act, Va. Code. 59.1-336

120.   Plaintiff incorporates by reference, as if fully set forth herein, the allegations of paragraphs 1 through 119 above.

121.   By virtue of their work on the Project pursuant to the MSA, Leonard and other Janus employees have direct and intimate knowledge of PGI's trade secrets including, but not limited to: the training plan developed for the Project by PGI, pricing documentation, recruiting documentation, and other confidential information from which PGI derives independent economic value from not being generally known or readily ascertainable by proper means by other persons who can obtain economic value from their disclosure or use.

122.   PGI has taken reasonable efforts to ensure that its trade secrets remain secret, such as including a Confidentiality clause (paragraph 13) in the MSA between PGI and Janus.

123.   PGI is informed and believes that Janus has used and/or intends to use PGI's trade secrets in an effort to gain an unfair competitive advantage over PGI and win the Project when the contract goes up for rebid.

124.   PGI is informed and believes that Janus has used PGI trade secrets in communication with PGI's USG Client in an effort to undermine PGI and weaken the relationship between PGI and its USG Client.

125.   PGI is informed and believes that Janus has shared and/or intends to share PGI's trade secrets with PGI's competitors.

126.   Janus is fully aware that it is required under the terms of the MSA to maintain the secrecy of PGI's trade secrets.

127.   As a result of the foregoing, PGI has suffered and will imminently suffer irreparable harm and loss. Accordingly, PGI is entitled to preliminary and permanent injunctive

relief, compensatory and punitive damages in an amount to be determined at trial, attorneys fees and costs.

## COUNT IV
## FRAUD

128. Plaintiff incorporates by reference, as if fully set forth herein, the allegations of paragraphs 1 through 127 above.

129. On or about April 22, 2016, Craddock, CEO of PGI, emailed Weakley, President and COO of Janus. In that email, Craddock requested a meeting with Weakley to address Janus' unauthorized equipment procurement and the working relationship between PGI and Janus.

130. On or about April 22, 2016, Weakley responded to Craddock's April 22, 2016 e-mail, stating, in relevant part: "Thank you for reaching out and letting me know of your concerns. I appreciate your valuing the relationship with Janus and I can assure I value our partnership with PGI as well. It's from that basis that we will work together to resolve the issues you have presented and address all concerns."

131. Weakley's representations, made for and on behalf of Janus, that "I value our partnership with PGI as well. It's from that basis that we will work together to resolve the issues you have presented and address all concerns" were false when they were made by Weakley.

132. In fact, at the same time Weakley (on behalf of Janus) was seeking to assure PGI with statements of continued harmony, partnership, and cooperation, Janus was surreptitiously maneuvering with employees of the USG Client to ensure that Janus would replace PGI as the Prime Contractor on the Project.

133. On or about May 3, 2016, Weakley met with, *inter alia,* Craddock, Beach, Robert Whitfield, COO of PGI, Jesse Sanders, VP of PGI, and Matt Hulsey, VP of Janus. PGI's purpose for the meeting was to follow up on the concerns raised by Craddock in his April 22,

2016 e-mail to Weakley and to determine if Janus was interested in continuing to work with PGI as a partner on the Project, or if it intended to proceed as a competitor.

134. In that May 3, 2016 meeting, Weakley apologized for Toy's behavior and re-affirmed that Toy would no longer be involved in the Project.

135. In that May 3, 2016 meeting, the PGI staff and officers present addressed a number of concerns and infractions of the MSA by Janus, including, but not limited to: the unauthorized purchase of equipment by Janus; Leonard's deliberate, repeated, and improper circumvention of PGI in his dealing with the USG Client; lack of adequate communication from Janus; lack of adequate invoice support by Janus; Janus' failure to staff certain positions (and the resultant harm to PGI's reputation with the USG Client); the staffing of a key position on the Project by Janus without the required qualifications (and the resultant harm to PGI's reputation with the USG Client); the removal of two Janus employees, for cause, from the Project (and the resultant harm to PGI's reputation with the USG Client); and the repeated (and unannounced) name changes by Janus (and the issues those name changes have caused with the USG Client).

136. In that May 3, 2016 meeting, Hulsey agreed that these were serious issues and committed to fixing these issues immediately. Hulsey's assertions have proven to be false.

137. Throughout that May 3, 2016 meeting, Weakley and Hulsey repeatedly stated that Janus was PGI's "trusted partner" and that Janus would not be competing against PGI in any future re-compete of the Project. Their assertions have proven to be false.

138. The May 3, 2016 meeting ended with handshakes and formalities all around, and with the agreement between PGI and Janus that they would work together on the potential re-compete of the Project and the further agreement that Janus would promptly work to correct the issues addressed during the meeting. Again, Janus' representations have proven to be false.

139.    Weakley's and/or Hulsey's April 22, 2016 and May 3, 2016 statements were false statements of material fact.

140.    Weakley's and/or Hulsey's April 22, 2016 and May 3, 2016 statements were made intentionally and knowingly.

141.    Weakley's and/or Hulsey's April 22, 2016 and May 3, 2016 statements were made with the intent to mislead PGI.

142.    PGI did reasonably rely on Weakley's and/or Hulsey's April 22, 2016 and May 3, 2016 statements and has been harmed as a result.

143.    As a result of the foregoing, PGI is entitled to compensatory and punitive damages in an amount to be determined at trial, attorneys fees and costs.

## COUNT V
## VIRGINIA BUSINESS CONSPIRACY
### Virginia Business Conspiracy Act, Va. Code §§ 18.2-499 & 18.2-500

144.    Plaintiff incorporates by reference, as if fully set forth herein, the allegations of paragraphs 1 through 143 above.

145.    On multiple occasions, Janus has conspired with others to willfully and maliciously injure PGI's reputation, trade, business and/or profession.

146.    Janus intentionally, purposefully, and in violation of the MSA between the Parties, the DTSA, and the VUTSA, negotiated with Osen-Hunter to enter into a teaming agreement in order to poach PGI's employees and steal PGI's trade secrets. These actions caused harm to PGI's business and resulted in PGI's trade secrets being disclosed to PGI's competitors.

147.    On a number of occasions, Janus intentionally, purposefully, and in violation of the MSA, conspired with PGI's USG Client, and certain employees thereof, in an attempt to harm PGI's reputation and business. These actions did cause harm to PGI's reputation and

business, and have resulted in, *inter alia,* negative performance reviews, damage to PGI's reputation and relationship with its USG Client, the loss of an award term for the Project, and decreased opportunity for PGI to obtain future contracts.

148.    As a result of the foregoing, PGI has suffered and will imminently suffer irreparable harm and loss. Accordingly, PGI is entitled to preliminary and permanent injunctive relief, compensatory and punitive damages in an amount to be determined at trial, attorneys fees and costs.

**COUNT VI**
**ATTEMPTED BUSINESS CONSPIRACY**
**Virginia Business Conspiracy Act, Va. Code §§ 18.2-499 & 18.2-500**

149.    Plaintiff incorporates by reference, as if fully set forth herein, the allegations of paragraphs 1 through 148 above.

150.    On multiple occasions, Janus has attempted to conspire with others to willfully and maliciously injure PGI's reputation, trade, business and/or profession.

151.    Janus' repeated attempts to solicit Masters and Gibson to work for Janus and provide Janus with confidential PGI information and trade secrets were intentional, purposeful, and unlawful attempts to conspire to harm PGI's business.

152.    Janus intentionally, purposefully, and in violation of the MSA between the Parties, the DTSA, and the VUTSA, negotiated, or attempted to negotiate with Osen-Hunter to enter into a teaming agreement in order to poach PGI's employees and steal PGI's trade secrets. These actions caused harm to PGI's business and resulted in PGI's trade secrets being disclosed to PGI's competitors.

153.    On a number of occasions, Janus intentionally, purposefully, and in violation of the MSA, conspired, or attempted to conspire with PGI's USG Client, and certain employees

thereof, in an attempt to harm PGI's reputation and business. These actions did cause harm to PGI's reputation and business, and have resulted in, *inter alia,* negative performance reviews, damage to PGI's reputation and relationship with its USG Client, loss of an award term for the Project, and decreased opportunity to obtain future contracts.

154. PGI is entitled to recover treble damages on these losses, including lost profits, punitive damages, injunctive relief, its costs of suit, reasonable attorneys fees and its costs of suit.

## COUNT VII
## COMMON LAW CONSPIRACY

155. Plaintiff incorporates by reference, as if fully set forth herein, the allegations of paragraphs 1 through 154 above.

156. On multiple occasions, Janus has conspired with others to unlawfully misappropriate PGI's trade secrets in violation of the DTSA and VUTSA and the MSA between the Parties. On multiple occasions, Janus has also attempted to conspire with others to willfully and maliciously injure PGI's reputation, trade, business and/or profession.

157. Janus' negotiations to enter into a teaming agreement with Osen Hunter in order to poach PGI's employees and obtain confidential PGI information and trade secrets constitute a material violation of the MSA between PGI and Janus.

158. Janus' communications with Osen Hunter in which they have used and plan to use PGI's trade secrets are not only violations of the MSA's confidentiality clause, but are also violations of the DTSA and VUTSA. This conduct has resulted and will result in PGI's trade secrets being disclosed to PGI's competitors.

159. Janus' communications with PGI's USG Client, and certain employees thereof, are material violations of the MSA, the Joint Ethics Regulations, and have resulted in, *inter alia,*

negative performance reviews, damage to PGI's reputation, loss of an award term on the Project, and decreased opportunity for PGI to obtain future contracts.

160.    PGI is entitled to recover treble damages on these losses, including lost profits, punitive damages, injunctive relief, its costs of suit, reasonable attorneys fees and its costs of suit.

## COUNT VIII
## TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS AND BUSINESS EXPECTANCY

161.    Plaintiff incorporates by reference, as if fully set forth herein, the allegations of paragraphs 1 through 160 above.

162.    PGI has a valid contractual relationship and business expectancy with the USG Client. Janus is fully aware of this relationship and business expectancy.

163.    PGI is informed and believes that Janus on a number of occasions has communicated with PGI's USG Client in an effort to undermine PGI and weaken the relationship between PGI and its USG Client.

164.    On one such occasion, Leonard corresponded directly with PGI's USG Client, submitting a new training plan and pricing proposals for the Project that would increase costs and make it harder for PGI to perform the Project. PGI's Business Manager was not notified prior to Janus sending these materials, nor did Janus receive authorization pursuant to the MSA to communicate directly with PGI's USG Client.

165.    As a result of this unauthorized communication, PGI was obliged to adhere to the new training plan and pricing proposals that Janus submitted, thus making the Project less profitable and harder for PGI to complete.

166.   PGI is informed and believes that Janus intentionally acted to damage PGI's relationship with its  USG Client by, *inter alia*: submitting or caused to be submitted incorrect invoices and timesheets; making unauthorized purchases in an effort to exceed the budget; failing to pay 1099 independent contractors; failing to staff at least one key Project position; staffing a key position on the Project by a Janus employee/contractor without the required qualifications; and failing to notify PGI of Janus' serial name changes.

167.   Janus' conduct has damaged PGI's reputation with the USG Client, and resulted in the USG eliminating one of PGI's award terms under the Project.  As a result, PGI also received negative performance reviews from the USG Client, thus causing PGI unquantifiable harm, as past performance is an important metric in evaluating bidders for future federal contracts.

168.   While Janus holds itself out to PGI as PGI's "partner" in the Project, PGI and Janus are business competitors on other contracts and in their shared industry.  As such, the harm caused to PGI's professional reputation offers a direct competitive benefit to Janus.

169.   As a result of the foregoing, PGI has suffered and will imminently suffer irreparable harm and loss. Accordingly, PGI is entitled to preliminary and permanent injunctive relief, compensatory and punitive damages in an amount to be determined at trial, attorneys fees and costs.

<u>**PRAYER FOR RELIEF**</u>

WHERFORE, Plaintiff prays that the Court:

(1)   Enter judgment in favor of Patriot Group International, Inc. and against Defendant Janus Global Operations LLC;

(2)     Declare that Janus' conduct has been willful and that Janus has acted with fraud, malice and oppression;

(3)     Enter a preliminary and permanent injunction enjoining Janus, directly or indirectly, and whether alone or in concert with others, including any officer, agent, employee and/or representative of Janus, from:

>     (a)     Soliciting any business from, or initiating any further contact or communication with PGI's USG Client, related to goods and services presently provided by PGI pursuant to the Project;

>     (b)     Soliciting any PGI employee, or independent contractor hired by PGI, or initiating any further contact or communication with PGI employees and contractors, for one year;

>     (c)     Using, disclosing, or transmitting for any purpose, including the solicitation or conducting of business with PGI's USG Client, any and all of PGI's confidential information or trade secrets; and

>     (d)     Destroying, erasing, deleting, or otherwise making unavailable for further proceedings related to this matter or PGI's continued performance of the Project, any records or documents (including data or information stored in computer files or other electronic storage media) in Janus' possession or control which were obtained from PGI or which relate to any of the events alleged in this Complaint;

(4)     Enter judgment awarding PGI actual damages from Janus adequate to compensate PGI for Janus' activity complained of herein and for any injury complained of herein, including but not limited to interest and costs, in an amount to be proven at trial;

(5)     Enter judgment awarding enhanced, trebled, exemplary and special damages, as permitted by law, in an amount to be proved at trial;

(6)     Enter judgment awarding attorneys' fees and costs; and

(7)     Order such other relief that the Court deems just and reasonable.

## JURY DEMAND

PGI demands a trial by jury on all claims so triable.

Respectfully submitted,

July 15, 2016                    By: */s/  Daniel S. Ward*

Daniel S. Ward, VSB # 45978
Ward & Ward, P.L.L.C.
2020 N Street, N.W.
Washington, DC 20036
(202) 331-8160
(202) 331-8162 (Fax)
dan@wardlawdc.com


Ryan C. Berry, VSB # 67956
Greenberg Traurig, LLP
1750 Tysons Boulevard
Suite 1000
McLean, VA  22102
Telephone: (703) 749-1369
Facsimile: (703) 714-8388
E-mail: berryr@gtlaw.com

*COUNSEL FOR PLAINTIFF*

.