UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

CLERK US DISTRICT COURT

**PATRIOT GROUP INTERNATIONAL, INC.**

Plaintiff,

v.

**JANUS GLOBAL OPERATIONS LLC, f/k/a
STERLING GLOBAL OPERATIONS, INC.,
f/k/a EOD TECHNOLOGY, INC.**

Defendant.

Civil Action Number: 1:16-CV-907

---

## MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Plaintiff Patriot Group International, Inc. ("PGI"), by and through the undersigned counsel, respectfully submits this Memorandum in Support of Plaintiff's Motion for a Temporary Restraining Order and Preliminary Injunction against Defendant Janus Global Operations LLC ("Janus"), f/k/a Sterling Global Operations, Inc., f/k/a EOD Technology, Inc., pursuant to Fed. R. Civ. P. 65(a) and (b), the Defend Trade Secrets Act of 2016 ("DTSA"), 18 U.S.C. § 1836, the Virginia Uniform Trade Secrets Act ("VTSA"), Va. Code. 59.1-336, and the Virginia Business Conspiracy Act ("VBCA"), Va. Code § 18.2-500. For the reasons set forth below, the court should grant the motion.

## I.     FACTUAL BACKGROUND

PGI, the Plaintiff in this Action, holds a contract with a U.S. Government Client ("USG Client") for professional services involving sensitive national security matters (the "Project"). As detailed below and in the Complaint, PGI's subcontractor on the Project, Janus, conspired

with others, including certain government officials with responsibility for the Project, to harm PGI's business and reputation, to displace PGI in favor of Janus as the U.S. Government's prime contractor, to unlawfully poach PGI's employees and misappropriate its trade secrets, all to the intended ruin of PGI. When PGI discovered this conspiracy and the imminent threat it presents, it filed this Action and the instant Motion for injunctive relief.

### *Contracts and Agreements Between PGI and Janus*

On or about August 1, 2012, PGI and EOD Technology, Inc., now Janus[1], entered into a Master Subcontract Agreement ("MSA") under the terms of which PGI, as the Prime retained Janus to perform certain professional services as a subcontractor in furtherance of the performance of the Project. A redacted copy[2] of the MSA is attached as **Exhibit A**, and sections of the MSA relevant to the instant motion are excerpted, in pertinent part, below.

Paragraph 13 of the MSA states the following:

**CONFIDENTIALITY**
During the performance of the Work, and for two (2) years after completion, each Party, unless otherwise agreed to in writing by the other Party, shall not release information regarding the Work or terms of this Agreement, Purchase Order, modifications (including all exhibits, attachments, reports, financial information associated with these documents and this program), and client supplied documentation to any person other than the disclosing Party's authorized representative solely for purposes of carrying out such Party's obligations under this Agreement, except (i) for information that is in the public domain through no fault of the disclosing Party, and (ii) to the extent such release is required by law. EODT agrees to hold in confidence all confidential information relating to this client. Confidential information shall not be disclosed to anyone other than the Client and those specifically cleared by the Client to perform under this contract.

---

[1] The original MSA was between PGI and EODT. EODT has changed its name and corporate structure twice during the term of the MSA. This Memorandum refers to "EODT" when quoting directly from the MSA, but otherwise uses the contracting party's current name.

[2] PGI has refrained from filing certain materials (including the "Statement of Work" referenced in the MSA) due to the sensitive nature of its work for the U.S. Government. Subject to appropriate security measures, and the approval of PGI's government client, PGI will provide unredacted copies to the Court under seal and/or for in camera review.

Paragraph 19 of the MSA states the following:

**CONTACT WITH PGI'S CLIENT**
In certain situations, EODT may, and only if required in performance of the Work, have dealings with PGI's Client. Otherwise, EODT is prohibited from contacting PGI's Client for matters dealing with the Scope of Work or Compensation. If PGI's Client initiates contact with EODT or requests information or services from EODT not in accordance with the Work, EODT shall immediately report said contact and requests to PGI.

Paragraph 20 of the MSA, provides, in relevant part, the following:

**PROCUREMENT INTEGRITY AND ETHICS**
EODT, in its dealing with PGI any other lower-tier subcontractor, and in any other matter relating to or arising out of the Work agrees to abide by all Federal Acquisition Regulation (FAR including the DFAR and DOSAR) provisions regarding Procurement Integrity (FAR 3.104), Code of Business Ethics and Conduct (FAR 3.1004), and Combating Trafficking in Persons (FAR 22.1700), the Procurement Integrity Act, Truth in Negotiations Act, the Foreign Corrupt Practices Act of 1977 (Public Law 95-213), as amended, and any other similar and applicable law for the country in which the Work is performed. Prohibited actions under this Agreement include but are not limited to bribery; kick-backs; gratuities; personal relationships and other conflicts of interests with government and/or contracting officials might provide EODT a knowing advantage; providing fraudulent or defective cost and pricing data; or the appearance of impropriety with regard to any of the foregoing.

Paragraph 22 of the MSA, which prohibits the Parties from hiring one another's employees, provides the following:

**HIRING OF EMPLOYEES**
The Parties agree that during the term of this Agreement, and any Purchase Order(s) still in performance, and for a period of one (1) year thereafter that they will not hire either directly or indirectly any employee of the other Party, except as provided in Article 11 of this Agreement. This clause applies to any subsidiary, affiliate, or other entity owned or controlled by the Party. Further, the term "hire" as used in this paragraph includes any terms of financial, material, or like remuneration, monetary or otherwise offered to the Party's employee.

In furtherance of the Project, PGI issued three Purchase Orders to Janus under the MSA, which Janus signed and agreed to. Redacted copies of Purchase Orders under the Project are attached hereto as **Exhibit B.**

Section 1.2 of each Purchase Order ("PO") provides, in relevant part, that "Subcontractor shall furnish the necessary services of skilled professional personnel in support of the requirements described in the Statement of Work (SOW)…"

Section 1.8 of each PO provides, in relevant part, the following:

**Client Contacts**
Only the Prime Contractor can authorize additional tasks and change the scope of work.

All reports, memoranda, or any other written material developed by the Subcontractor during the performance of the effort herein for the Client, must be submitted through and with the written approval of the Business Manager. Where appropriate, the Subcontractor will be identified as having been the originator of such work. This provision is not intended to discourage or prohibit informal technical discourse between Subcontractor personnel and the Client.

### *Summary of Events*

On or about May 24, 2016, Randy Leonard ("Leonard"), a Janus Employee who is the Training Manger on the Project, attended a meeting with PGI employees, independent contractors hired by PGI, and other Janus employees. Lee Gibson ("Gibson"), the Project Manager and PGI employee, also attended the meeting. During the meeting, Leonard announced that there was no way that PGI will win the Project when the contract goes up for rebid. See **Exhibit C**, Affidavit of Lee Gibson, ¶3.

During that same May 24, 2016 meeting, Leonard drew a timeline on the whiteboard outlining how and why PGI was going to lose the Project, and how Janus would win it. Leonard claimed that USG representatives involved with the Project provided him with this information and informed him that there would be a transition period wherein the contractors would be replaced in phases to prevent them from banding together. See **Exhibit C**, Affidavit of Lee Gibson, ¶4. This communication between Leonard and PGI's client is in direct violation of Paragraph 19 of the MSA.

4

During that same May 24, 2016 meeting, Leonard told those in attendance that Janus was going to start running training sessions concurrently with project training sessions so that Janus could build up their numbers in an effort to bid on the Project. Leonard invited those attending the meeting to join the Janus training sessions. See **Exhibit C**, Affidavit of Lee Gibson, ¶5.

Pursuant to the terms of the MSA, Leonard and other Janus employees have intimate knowledge of the training plan developed for the Project by PGI. On a number of occasions, Leonard told to Gibson that he sent that training plan, and revisions thereto, directly to USG representatives involved with the Project so that the requirements and methodologies included therein could be incorporated into the Request for Proposal ("RFP") that the Government Client would use for rebidding the Project. See **Exhibit C**, Affidavit of Lee Gibson, ¶6. Such communications by Leonard directly to the Government Client are in direct violation of the terms of the MSA.

Leonard admitted on a number of occasions that he had discussions with USG representatives involved with the Project in which those USG representatives informed Leonard that demonstrating the training would be a part of the bidding process, thus giving Janus an unfair competitive advantage over PGI, and any other bidders on the Project, because Janus is the only company (other than PGI) with knowledge of the advanced training methods currently used by PGI. See **Exhibit C**, Affidavit of Lee Gibson, ¶7. Such communications by Leonard directly to the Government Client are in direct violation of the terms of the MSA.

In or about March, 2016, Leonard corresponded directly with PGI's client, submitting a new training plan and pricing proposals for the Project that would increase costs and make it harder for PGI to perform the Project. PGI's Business Manager was not notified prior to Janus sending these materials, nor did Janus receive authorization pursuant to the MSA to

communicate directly with PGI's client. As a result of this unauthorized communication, PGI was obliged to adhere to the new training plan and pricing proposals that Janus submitted, thus making the Project less profitable and harder for PGI to complete. See **Exhibit E**, Affidavit of Greg Craddock, ¶13. Such communications by Leonard directly to the Government Client are in direct violation of the terms of the MSA.

On or about March 29, 2016, Leonard corresponded directly with PGI's Client, materially altering the training calendar to be approved by the Client. Leonard did not receive authorization pursuant to the MSA to communicate directly with PGI's client. This unauthorized communication resulted in increased costs for PGI. See **Exhibit E**, Affidavit of Greg Craddock, ¶14. Again, such communications by Leonard directly to the Government Client are in direct violation of the terms of the MSA.

In or about May of 2016, Leonard approached Kenneth Masters ("Masters"), a PGI employee who is the Operations Coordinator of the Project, and as such is integral to the success of the Project. See **Exhibit D**, Affidavit of Kenneth Masters, ¶1, 3.

In that May 2016 conversation, Leonard informed Masters that the Project was going up for re-bid, and that there was no way that PGI was going to win the re-bid. See **Exhibit D**, Affidavit of Kenneth Masters, ¶4.

During that May 2016 conversation, and/or in additional conversations thereafter, Leonard stated that Masters was extremely valuable to Project, and that Janus would hire Masters to do the same job when Janus is awarded the bid on the Project. Masters viewed these statements as an effort by Leonard to recruit him to work for Janus. See **Exhibit D**, Affidavit of Kenneth Masters, ¶5.

6

During that conversation, and/or in additional conversations thereafter, Leonard stated that Masters was extremely valuable to the Project, Leonard stated that the Project would "fail" if Masters quit, and intimated that would be the best way to ensure that PGI did not win the re-bid of the Project. See **Exhibit D**, Affidavit of Kenneth Masters, ¶6.

On or about May 26, 2016, Leonard told Gibson that Janus was actively recruiting Masters. After hearing this from Leonard, Gibson talked to Masters about his interactions with Leonard.  Masters informed Gibson that Leonard had spoken to Masters about working for Janus, and that Leonard had asked Masters for his personal email address. Again, Leonard's efforts to recruit a PGI employee are a direct and material violation of the MSA by Janus. See **Exhibit C**, Affidavit of Lee Gibson, ¶8.

In or about June of 2016, Leonard asked Masters for his personal e-mail address, which Masters provided to him. See **Exhibit D**, Affidavit of Kenneth Masters, ¶7.

In or about June 2016, one of the contractors working on the Project approached Gibson with concerns that Janus had given him certificates for trainings that he had not completed. Not only do the certificates indicate that Janus/Sterling conducted specialized trainings that never took place, the total hours of the combined trainings as indicated on the certificates are well beyond the time spent in the actual trainings that took place.  In speaking with numerous members of the PGI corporate management team, Gibson learned that these fictitious certifications were never authorized by PGI. See **Exhibit C**, Affidavit of Lee Gibson, ¶11.

In or about the June 3-7, 2016 time period, Leonard was with Gibson at the training office. At that time, Leonard asked Gibson if he would be comfortable with Leonard getting letters of intent from the contractors saying that they would work for Janus when the Project goes

up for rebid. Gibson told Leonard that he was not comfortable with that. See **Exhibit C**, Affidavit of Lee Gibson, ¶9.

In June 2016, Leonard told Gibson to keep Greg Craddock, CEO of PGI ("Craddock"), and Christy Beach, PGI VP of Contracts and Business Manager of the Project ("Beach"), out of the loop on communications regarding the Project. Again, these statements by Leonard are admissions of direct and material violations of the MSA by Janus. See **Exhibit C**, Affidavit of Lee Gibson, ¶12.

On or about July 1, 2016, Leonard called Gibson and stated that a USG representative involved with the Project informed Leonard that he (the USG representative) is waiting for Leonard to provide the client with a copy of an updated training plan so the Government Client can use that updated training plan to draft the RFP. This is yet another admission of direct and material violations of the MSA by Janus. See **Exhibit C**, Affidavit of Lee Gibson, ¶13.

In that same July 1, 2016 telephone conversation, Leonard informed Gibson that, depending on the requirements that are ultimately written into the RFP, Janus would like to propose Gibson as Project Manager in their bid for the Project. Again, these statements by Leonard are admissions of direct and material violations of the MSA by Janus. See **Exhibit C**, Affidavit of Lee Gibson, ¶14.

In that same July 1, 2016 conversation, Leonard requested that Gibson provide him with sensitive and confidential PGI pricing and compensation information. Again, these statements by Leonard are admissions of direct and material violations of the MSA by Janus. See **Exhibit C**, Affidavit of Lee Gibson, ¶15.

In that same July 1, 2016 conversation, Leonard informed Gibson that the RFP would probably come out between July 15, 2016, and August 15, 2016. See **Exhibit C**, Affidavit of Lee Gibson, ¶16.

In that same July 1, 2016 conversation, Leonard told Gibson that there was going to be a requirement for a Professional Project Manager with a certain number of years experience running a program with a annual budget of at least $25,000,000. Leonard stated that he received this information from a USG representative with supervisory authority over the Project. Again, these statements by Leonard are admissions of direct and material violations of the MSA by Janus. See **Exhibit C**, Affidavit of Lee Gibson, ¶17.

On or about June 28, 2016, Leonard sent Masters a "test" e-mail from his personal e-mail address to Masters' personal e-mail address. See **Exhibit D**, Affidavit of Kenneth Masters, ¶8.

On or about June 30, 2016, Leonard sent Masters an e-mail from his personal e-mail address to Masters' personal e-mail address stating the following:

Kenny,

Close hold between us please.  Send me all recruiting documentation that we currently use (all letters / questionnaire etc...)

Thanks man

See **Exhibit D**, Affidavit of Kenneth Masters, ¶9

Leonard's use of the term "close hold between us please" meant that he did not want Masters to disclose this request of his to anyone else.  Leonard wanted Masters to keep it secret.  That fact, combined with the fact that he wanted to arrange the transfer of confidential PGI recruiting documents to his personal e-mail led Masters to believe that this request was being made for an improper purpose. See **Exhibit D**, Affidavit of Kenneth Masters, ¶10.

On or about July 8, 2016, Leonard called Masters and asked why he had not sent Leonard PGI's recruiting documentation yet.  Leonard stated that he wanted Masters to send him the documents as word documents, not as .pdfs. See **Exhibit D**, Affidavit of Kenneth Masters, ¶11.

There is no legitimate business reason for Masters to send these confidential PGI documents, especially in a readily editable form, to Leonard at his personal e-mail address. See **Exhibit D**, Affidavit of Kenneth Masters, ¶12.

On or about July 8, 2016 Gibson had a telephone call with Leonard, in which Leonard again recruited Gibson to work for Janus on the Project. See **Exhibit C**, Affidavit of Lee Gibson, ¶18.

During that July 8, 2016 call, Leonard repeatedly said that Gibson will "have to make a choice" between PGI and Janus. See **Exhibit C**, Affidavit of Lee Gibson, ¶19

During that July 8, 2016 call, Leonard assured Gibson that if Janus is awarded the Project, Janus would hire Gibson as Program Manager ("PM") or Deputy Program Manager ("DPM"). See **Exhibit C**, Affidavit of Lee Gibson, ¶18. Leonard had made similar solicitations to Gibson in the past. See **Exhibit C**, Affidavit of Lee Gibson, ¶10.

During that July 8, 2016 call, Leonard informed Gibson that Janus is in negotiations with Osen-Hunter Group, LLC ("Osen-Hunter") to enter into a teaming agreement to bid on the Project. See **Exhibit C**, Affidavit of Lee Gibson, ¶21.

During that July 8, 2016 call, Leonard said that Janus' plan was to have Osen-Hunter, not Janus, hire Masters to work on the project in order to evade Janus' non-solicitation obligations to PGI.  See **Exhibit C**, Affidavit of Lee Gibson, ¶22.

During that July 8, 2016 call, Leonard repeatedly made representations that he was receiving inside information from USG representatives involved with the Project about the USG Client's plan to issue a RFP. See **Exhibit C**, Affidavit of Lee Gibson, ¶23.

During that July 8, 2016 call, Leonard again requested that Gibson provide Janus with information regarding PGI's current pricing information and pay rates. See **Exhibit C**, Affidavit of Lee Gibson, ¶24.

During that July 8, 2016 call, Gibson expressed concerns to Leonard about his requests for the confidential pricing and pay information and asked if it was "shady" to provide him that information. See **Exhibit C**, Affidavit of Lee Gibson, ¶25.

During that July 8, 2016 call, Leonard responded to this question by saying that "It would be shady if I did not know for certain that I was getting the program" and that "it's really not" shady to give Janus the pricing information in the current situation. See **Exhibit C**, Affidavit of Lee Gibson, ¶26.

On or about July 8, 2016, Leonard stated to Gibson that he might disclose sensitive PGI pricing information to PGI's competitors. See **Exhibit C**, Affidavit of Lee Gibson, ¶27.

On or about July 12, 2016, Gibson and Leonard had a conversation with a USG representative with supervisory authority over the Project. In that conversation, the USG Representative explained to Gibson that if he "resigned tomorrow" from PGI and converted to a 1099, Gibson could evade his non-compete agreement with PGI and continue working on the Project after PGI lost the contract for the Project. See **Exhibit C**, Affidavit of Lee Gibson, ¶28.

In that same July 12, 2016 conversation, that same USG representative with supervisory authority over the Project stated that, while it was "possible" that PGI could win the re-bid of the contract (an assertion that brought uproarious laughter from Leonard), "It would be like me

11

kicking Brock Lesnar's ass." (Translation – virtually impossible). After saying that, the USG representative with supervisory authority over the Project said "do not say that to [PGI's Chief Executive Officer, Greg] Craddock." See **Exhibit C**, Affidavit of Lee Gibson, ¶29.

On or about July 13, 2016, Leonard e-mailed Masters asking Masters to send him the contact list for all contractors working on the Project. See **Exhibit D**, Affidavit of Kenneth Masters, ¶13. The list of the individuals working on the Project is sensitive and confidential PGI information. See **Exhibit D**, Affidavit of Kenneth Masters, ¶14. There is no legitimate business reason for Masters to send that information to Leonard at his personal email address. See **Exhibit D**, Affidavit of Kenneth Masters, ¶15.

On July 15, 2016, PGI terminated Janus for cause under the terms of the MSA. PGI's termination for cause of Janus was justified under, *inter alia*, Paragraph 11, Sections a, b, c, e, f, and i of the MSA.

## II.     LEGAL STANDARD

The standards for granting a temporary restraining order are the same as for a preliminary injunction. *Moore v. Kempthrone*, 464 F. Supp. 2d 519, 525 (E.D. Va. 2006). A plaintiff seeking a preliminary injunction must make a clear showing "(1) that he is likely to succeed on the merits, (2) that he is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in his favor, and (4) that an injunction is in the public interest." *Real Truth About Obama v. Fed. Election Comm'n*, 575 F. 3d 342, 346 (4th Cir. 2009) *vacated on other grounds by* 559 U.S. 1089 (2010); (quoting *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).

## III.     ARGUMENT

### A.     Plaintiff Is Likely to Succeed on the Merits

Due to Defendant's clearly unlawful breaches of the MSA, and the other facts demonstrated in the record, Plaintiff is likely to succeed on the merits of the claims for which it is seeking injunctive relief.

### 1.     Plaintiff Is Likely to Prevail on the DTSA Claim

As will be discussed below, Plaintiff will likely prevail on its Defend Trade Secrets Act of 2016 ("DTSA") claim against Janus. The information that Leonard surreptitiously requested from PGI employees, and the information that Leonard has shared and/or plans to share with USG employees and PGI competitors falls directly within the DTSA definition of trade secrets. Furthermore, Janus's actions, especially the actions of Janus employee Leonard, constitute a misappropriation of PGI's trade secrets.

The DTSA allows the owner of a trade secret to bring civil action provided that the trade secret is related to a service or product used in interstate commerce. 18 U.S.C. § 1836(b).  Given the nature of the products and services sold by PGI, and the fact that PGI is a North Carolina corporation with its principle place of business in Virginia, and Janus is a Delaware corporation with its principle place of business in Tennessee, these trade secrets relate to interstate commerce.

Under the DTSA, a "trade secret" is defined as:

> all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if—
> > (A) the owner thereof has taken reasonable measures to keep such information secret; and

**(B)** the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information;

18 U.S.C. § 1839(3). The DTSA defines the term "misappropriation" in relevant part as:

disclosure or use of a trade secret of another without express or implied consent by a person who--
**(i)** used improper means to acquire knowledge of the trade secret;
**(ii)** at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was--
**(I)** derived from or through a person who had used improper means to acquire the trade secret;
**(II)** acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or
**(III)** derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret;

18 U.S.C. § 1839(5).

The terms of the MSA between PGI and Janus, specifically the Confidentiality clause, make it clear that PGI took reasonable measures to protect its confidential information and to keep its trade secrets secret. The pricing and pay rate information that Leonard requested from Gibson is extremely valuable in the government contracting industry, as is the information about PGI's recruiting procedures that Leonard requested from Masters. This information is plainly within the DTSA's definition of trade secrets, which covers "financial, business, ... [and] economic" information. 18 U.S.C. § 1839(3).

PGI's training plan is extremely specialized, and was developed specifically for this Project. See **Exhibit E**, Affidavit of Greg Craddock, ¶13. This particular Project accounts for about 70% of PGI's total revenue, as such the fact that the training plan for this project is not publicly available is unquestionably of significant economic value to PGI. See **Exhibit E**, Affidavit of Greg Craddock, ¶5. Not only has Leonard shared, or is planning to share the training

plan with certain USG employees in violation of the DTSA, but he has also shared, or is planning to share this information and/or sensitive PGI pricing information with competitors of PGI in an effort to enter into a teaming agreement, and win the contract away from PGI. See **Exhibit C**, Affidavit of Lee Gibson, ¶13, 27. The furtive nature in which Leonard has attempted to acquire and disseminate PGI's confidential information is further evidence that not only is the information considered secret by PGI, but also that it has significant economic value to Janus and others. Again, the DTSA clearly covers information of this nature given that a trade secret includes "plans, ... methods, techniques, processes, procedures, [and] programs." 18 U.S.C. § 1839(3).

Pursuant to the DTSA, Janus's actions clearly constitute a misappropriation of PGI's trade secrets. Janus used improper means to acquire PGI's trade secrets, and then disclosed PGI's trade secrets without PGI's express or implied consent. The DTSA defines "improper means" to include "breach or inducement of a breach of a duty to maintain secrecy." 18 U.S.C. § 1839(6). Janus is under a duty to maintain the secrecy of PGI's trade secrets pursuant to section 13 of the MSA. Janus' dissemination of PGI's trade secrets without express or implied permission is therefore a violation of the DTSA. For the foregoing reasons, PGI is likely to succeed on the merits of its DTSA claim.

## 2. Plaintiff Is Likely to Prevail on the VUTSA Claim

Plaintiff will likely prevail on its Virginia Uniform Trade Secrets Act ("VUTSA") claim against Janus. The VUTSA is substantially similar to the DTSA, and as such the arguments presented below closely resemble those discussed previously in relation to the DTSA. The main difference between the DTSA and the VUTSA is that the VUTSA does not require that the trade secret be related to interstate commerce.

The information that Leonard surreptitiously requested from PGI employees, and the information that Leonard has shared with USG employees and PGI competitors falls directly within the VUTSA definition of trade secrets. Janus's actions, especially those of its employee, Leonard, constitute a misappropriation of PGI's trade secrets.

Under the VUTSA "trade secret" is defined as:

information, including but not limited to, a formula, pattern, compilation, program, device, method, technique, or process, that:
1. Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and
2. Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Va. Code § 59.1-336. The term "misappropriation" is defined as:

1. Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or
2. Disclosure or use of a trade secret of another without express or implied consent by a person who
a. Used improper means to acquire knowledge of the trade secret; or
b. At the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was
(1) Derived from or through a person who had utilized improper means to acquire it;
(2) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use;
(3) Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or
(4) Acquired by accident or mistake.

Va. Code § 59.1-336.

The terms of the MSA between PGI and Janus, specifically the Confidentiality clause (MSA § 13), make it clear that PGI took reasonable measures to protect its confidential information and to keep its trade secrets secret. The pricing and pay rate information that Leonard requested from Gibson is extremely valuable in the government contracting industry, as is the information about PGI's recruiting procedures that Leonard requested from Masters. This

information falls within realm of things that Virginia courts have considered trade secrets. *See* Milton E. Babirak, Jr., *The Virginia Uniform Trade Secrets Act: A Critical Summary of the Act and Case Law*, 5 Va. J.L. & Tech. 15, *30 (2000) (explaining that Virginia courts define trade secrets broadly to include everything from "high tech" secrets such as formulas or processes to "low tech" information like "business leads, financial information ... and methods of conducting business").

PGI's training plan is extremely specialized, and was developed specifically for this Project. *See* **Exhibit E**, Affidavit of Greg Craddock, ¶13. This particular Project accounts for about 70% of PGI's total revenue, as such the fact that the training plan for this Project is not publicly available is unquestionably of significant economic value to PGI. *See* **Exhibit E**, Affidavit of Greg Craddock, ¶5. Not only has Leonard shared, or is planning to share the training plan with certain USG employees in violation of the VUTSA, but he has also shared, or is planning to share this information, and/or sensitive pricing information with competitors of PGI in an effort to enter into a teaming agreement, and win the contract away from PGI. *See* **Exhibit C**, Affidavit of Lee Gibson, ¶13, 27. The furtive nature in which Leonard has attempted to acquire and disseminate PGI's confidential information is further evidence that not only is the information considered secret by PGI, but also that it has significant economic value to Janus and others.

Pursuant to the VUTSA, Janus's actions clearly constitute a misappropriation of PGI's trade secrets. Janus used improper means to acquire PGI's trade secrets, and then disclosed PGI's trade secrets without PGI's express or implied consent. The VUTSA defines "improper means" to include "breach of a duty or inducement of a breach of a duty to maintain secrecy." Va. Code 59.1-336. Janus is under a duty to maintain the secrecy of PGI's trade secrets pursuant to section

13 of the MSA. Janus' dissemination of PGI's trade secrets without express or implied permission is therefore a violation of the VUTSA. For the foregoing reasons, PGI is likely to succeed on the merits of its VUTSA claim.

### 3. Plaintiff Is Likely to Prevail on its Breach of Contract Claims for which it seeks injunctive relief.

Given the amount of evidence already provided, before a single disclosure has been made or scrap of discovery exchanged, there is little doubt that PGI will succeed on its breach of contract claims relating to enforcing Janus' agreed upon restrictive covenants.

Under Virginia Law, a breach of contract requires (1) a legally enforceable obligation, (2) the defendant's material breach of that obligation, and (3) damage to the plaintiff caused by the breach of that obligation. *Ulloa v. QSP, Inc.,* 271 Va. 72, 79, 624 S.E.2d 43, 48 (Va. 2006) (quoting *Filak v. George,* 267 Va. 612, 594 S.E.2d 610, 614 (2004)). It is well-established in Virginia that restrictive covenants will be enforced in these types of agreements only if they are (a) narrowly drawn to protect the legitimate business interests, (b) not unduly burdensome on the employee's or subcontractor's ability to make a living, and (c) not against public policy. *Preferred Sys. Sols., Inc. v. GP Consulting, LLC,* 284 Va. 382, 392-93, 732 S.E.2d 676, 681 (2012) (quoting *Omniplex World Servs. v. U.S. Investigations Servs.,* 270 Va. 246, 249, 618 S.E.2d 340, 342 (2005).

The restrictive covenants in the MSA between PGI and Janus are narrowly tailored and do not unduly burden Janus's ability to make a living. Both the Confidentiality, and Hiring of Employees clauses apply to both parties equally.

The confidentiality clause provides in relevant part:

> During the performance of the Work, and for two (2) years after completion, each Party, unless otherwise agreed to in writing by the other Party, shall not release information regarding the Work ... to any person other than the disclosing Party's

authorized representative solely for purposes of carrying out such Party's obligations under this Agreement.

See MSA § 13.

The Hiring of Employees clause provides in relevant part: "The Parties agree that during the term of this Agreement … and for a period of one (1) year thereafter that they will not hire either directly or indirectly any employee of the other Party." See MSA § 22.

Both of these clauses are enforceable under Virginia law. Not only are the restrictions narrowly drawn to protect PGI's legitimate business interests, but the restrictions apply to both Parties equally; Janus' business interests are protected just the same as PGI's. PGI's confidential information and trade secrets are of utmost importance to its continued success in this market, as are PGI's employees. It is well established in Virginia that an employer's control of its trade secrets and confidential information gives an element of reasonableness to a restriction on competition, and is "always regarded as a strong reason for upholding the contract." *Stoneman v. Wilson,* 169 Va. 239, 247, 192 S.E. 816, 819 (1937).

These contractual restrictions are not unduly burdensome for Janus, but it would be an undue burden on PGI if Janus were allowed to disclose PGI's trade secrets and poach PGI's employees – both of which Janus have already attempted to do. Prohibiting Janus from hiring PGI's employees and from disclosing PGI's confidential information for one and two years respectively is not going to create an undue burden on Janus' ability to make a living. The MSA allows Janus to conduct business in any way it sees fit, so long as it does not hire PGI's employees or use PGI's confidential information. The contract clauses in question are narrowly drawn and not unduly burdensome; the contract protects PGI and Janus alike, and serves the public interest.

As outlined above, Janus' actions clearly violate the Confidentiality and Hiring of Employees clauses in the MSA. Leonard's disclosure of PGI's trade secrets and confidential information to USG representatives and PGI competitors constitutes a material breach of Section 13 of the MSA, the Confidentiality clause. Likewise, Leonard's repeated efforts to solicit PGI employees to work for Janus, or to have one of PGI's competitors hire PGI employees, are material breaches of Section 22 of the MSA, the Hiring of Employees clause.

Janus' material breaches of the contract have caused, or will cause, PGI significant damage and irreparable harm. See **Exhibit E**, Affidavit of Greg Craddock, ¶7, 8, 15. Keeping PGI's trade secrets secret is vital to PGI's success. See **Exhibit E**, Affidavit of Greg Craddock, ¶7. Leonard's disclosure of these secrets to USG employees, and especially to PGI's competitors has, and will cause incalculable harm to PGI and PGI's employees. Similarly, if Janus is permitted to continue its efforts to poach PGI employees, including Masters and Gibson, who are integral to the success of the Project, it will be increasingly difficult and costly for PGI to perform on the Project. See **Exhibit E**, Affidavit of Greg Craddock, ¶8.

### 4. Plaintiff Is Likely to Prevail on the Claims of Business Conspiracy and Attempted Business Conspiracy

The Virginia Business Conspiracy Act ("VBCA"), provides in relevant part that injured parties have a cause of action against:

A.      Any two or more persons who combine, associate, agree, mutually undertake or concert together for the purpose of (i) willfully and maliciously injuring another in his reputation, trade, business or profession by any means whatever…[and]

B.      Any person who attempts to procure the participation, cooperation, agreement or other assistance of any one or more persons to enter into any combination, association, agreement, mutual understanding or concert prohibited in subsection A of this section.

Va. Code § 18.2-499. In order to prevail on the statutory conspiracy claim, PGI "must prove the following elements by clear and convincing evidence: (1) that the defendants agreed or conspired with another party or parties; (2) that the conspirators acted with legal malice, that is, intentionally, purposefully, and without lawful justification; and (3) that the intentional actions of the conspirators proximately caused injury." *DAG Petroleum Suppliers. LLC v. BP PLC*, 268 Fed.Appx. 236, 243 (4th Cir. 2008) (citing *Simmons v. Miller*, 544 S.E.2d 666, 676-77 (Va. 2001)).

Janus' agent, Leonard, has admitted that Janus is currently negotiating with Osen-Hunter to form a teaming agreement to win the contract away from PGI. See **Exhibit C**, Affidavit of Lee Gibson ¶ 21. Leonard also admitted that Janus plans to have Osen-Hunter, not Janus, hire Kenneth Masters to work on the project in order to evade Janus' non-solicitation obligations to PGI. See **Exhibit C**, Affidavit of Lee Gibson ¶ 22. In support of that effort to team with a competitor of PGI to compete against PGI, Janus will benefit from its theft of PGI trade secrets and poaching of PGI employees. Janus' negotiations and agreements with Osen-Hunter were pursued intentionally, purposefully, and violate the MSA between PGI and Janus, the VUTSA, and the DTSA. These actions taken by Janus and Osen-Hunter have caused and will continue to cause PGI significant injury, as "[t]he disclosure of trade secrets establishes immediate irreparable harm." *Home Funding Group, LLC v. Myers*, E.D. Va. No. 1:06CV1400 JCC, 2006 WL 6847953, at *2 (E.D. Va. Dec. 14, 2006). Furthermore, the loss of Masters would cause irreparable harm to PGI's work on the project. See **Exhibit E**, Affidavit of Greg Craddock ¶ 8.

Similarly, Janus conspired and/or is conspiring with USG employees in an effort to have PGI lose the contract for the Project. See **Exhibit C**, Affidavit of Lee Gibson ¶4, 6, 7, 13, 17, 23, 28, 29. Janus conspired and/or is conspiring with USG employees to encourage PGI employees,

including but not limited to Gibson, to resign from PGI and revert to 1099 status in an effort to circumvent non-compete and/or anti-poaching agreements. See **Exhibit C**, Affidavit of Lee Gibson ¶28. Communications of this nature between Janus and the USG employees were intentional, purposeful, and are direct and material violations of the MSA, the Joint Ethics Regulations, and potentially the Procurement Integrity Act. As a result of Janus' conspiracy with USG employees, PGI has had its reputation irreparably harmed, and has received negative performance reviews, which will detrimentally affect PGI's potential to obtain future contracts. Furthermore, the loss of Gibson would cause irreparable harm to PGI's work on the project. See **Exhibit E**, Affidavit of Greg Craddock ¶8

The VBCA also provides a cause of action for attempted conspiracy. Under Virginia law "any person who attempts to procure the participation of others in an attempt to wilfully and maliciously injure another in his reputation, trade, business, or profession can be liable for statutory conspiracy." *Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, 108 F.3d 522, 526 (4th Cir. 1997) Janus' efforts to solicit PGI employees, including Masters and Gibson, and have those employees provide Janus with PGI trade secrets and confidential information, constitute attempted conspiracy under the VBCA. Likewise, Janus' attempts to enter into a teaming agreement with Osen-Hunter to poach PGI's employees and steal PGI's trade secrets, constitute attempted conspiracy under the VBCA. Janus' communications with the government in an effort to undermine PGI's business reputation, and to make it harder to PGI to perform on the project, constitute attempted conspiracy under the VBCA.

### 5.   Plaintiff Is Likely to Prevail on the Claim of Common Law Conspiracy

The elements of common law civil conspiracy under Virginia law are "(i) an agreement between two or more persons (ii) to accomplish an unlawful purpose or to accomplish a lawful

purpose by unlawful means, which (iii) results in damage to plaintiff." *Firestone v. Wiley*, 485 F.Supp.2d 694, 703 (E.D.Va. 2007).

Janus' agent, Leonard, has admitted that Janus is currently negotiating with Osen-Hunter to form a teaming agreement to win the contract away from PGI. See **Exhibit C**, Affidavit of Lee Gibson ¶ 21. Leonard also admitted that Janus plans to have Osen-Hunter, not Janus, hire Kenneth Masters to work on the project in order to evade Janus' non-solicitation obligations to PGI. See **Exhibit C**, Affidavit of Lee Gibson ¶22. In support of that effort to team with a competitor of PGI to compete against PGI, Janus will benefit from its theft of PGI trade secrets and poaching of PGI employees. Janus' negotiations and agreements with Osen-Hunter are unlawful, and in direct violation of the MSA between PGI and Janus, the VUTSA, and the DTSA. These actions taken by Janus and Osen-Hunter have caused and will continue to cause PGI significant injury, as "[t]he disclosure of trade secrets establishes immediate irreparable harm." *Home Funding Group, LLC v. Myers*, E.D. Va. No. 1:06CV1400 JCC, 2006 WL 6847953, at *2 (E.D. Va. Dec. 14, 2006). Furthermore, the loss of Masters would cause irreparable harm to PGI's work on the project. See **Exhibit E**, Affidavit of Greg Craddock ¶ 8

Similarly, Janus conspired and/or is conspiring with USG employees in an effort to have PGI lose the contract for the Project. See **Exhibit C**, Affidavit of Lee Gibson ¶29. Janus conspired and/or is conspiring with USG employees to encourage PGI employees, including but not limited to Gibson, to resign from PGI and revert to 1099 status in an effort to circumvent non-compete and/or anti-poaching agreements. See **Exhibit C**, Affidavit of Lee Gibson ¶28. Communication of this nature between Janus and the USG employees are direct and material violations of the MSA, the Joint Ethics Regulations, and potentially the Procurement Integrity Act. As a result of Janus' conspiracy with USG employees, PGI has had its reputation

irreparably harmed, and has received negative performance reviews, which will detrimentally affect PGI's potential to obtain future contracts. Furthermore, the loss of Gibson would cause irreparable harm to PGI's work on the project. See **Exhibit E**, Affidavit of Greg Craddock ¶8

**B.      Plaintiff Is Likely to Suffer Irreparable Harm in the Absence of Preliminary Relief**

Every moment that passes is another opportunity for Janus to steal PGI's trade secrets in violation of the DTSA and VUSTA, to disclose PGI's confidential information, and poach PGI's employees in direct violation of Janus' obligations under the MSA. Absent the injunctive relief sought herein, PGI will suffer irreparable damage to its business. It is impossible to calculate what damage Janus has caused and will continue to cause by its theft and disclosure of PGI's trade secrets. This court has said: "The disclosure of trade secrets establishes immediate irreparable harm." *Home Funding Group, LLC v. Myers*, E.D. Va. No. 1:06CV1400 JCC, 2006 WL 6847953, at *2 (E.D. Va. Dec. 14, 2006).

PGI will also likely suffer irreparable harm if Janus is allowed to continue its efforts to poach PGI's key employees and personnel. See **Exhibit E**, Affidavit of Greg Craddock ¶ 8. This is not only because those employees have knowledge of PGI's trade secrets, but also because the loss of those key employees will severely impact PGI's continued ability to perform under the Project. See **Exhibit E**, Affidavit of Greg Craddock ¶ 8

Further, without an injunctive order preventing Janus from communicating with PGI's client, Janus will continue to tortiously interfere with PGI's contract with its Client, and will continue to conspire and attempt to conspire with USG employees to damage PGI's reputation, and to encourage PGI employees to leave PGI to work for Janus.

**C.**     **The Balance of Equities Tips in Plaintiff's Favor**

The balance of equities strongly favors PGI in this matter. Janus has no lawful reason to access, use, or disclose PGI's trade secrets without PGI's permission. Similarly, Janus has no legitimate purpose for soliciting PGI's employees. The Parties entered into a fully enforceable agreement, which provides that neither Party will hire the other Party's employees, nor will either Party disclose the other Party's confidential information. To allow Janus to breach this agreement at the expense of PGI would be the height of inequity, and PGI will greatly suffer as a result. Likewise, Janus' tortious inference with the contract between PGI and the USG has caused and will continue to cause harm if not stopped. Providing injunctive relief would protect PGI, preserve the status quo, and have no legitimate or substantial adverse effect on Janus. The only consequence to Janus of the court's issuance of a temporary restraining order would be that Janus is forced to stop behaving unlawfully and is forced to honor its existing contractual agreements with PGI.

**D.**     **An Injunction Is in the Public Interest**

The final element to be considered when determining whether injunctive relief is warranted is whether the injunctive relief sought is in the public interest. This matter concerns a Project in support of the U.S. Government on sensitive matters of national security. As such, it directly impacts all citizens and taxpayers. It is in the best interests of the public that Janus be prohibited from continuing to interfere with, and jeopardize, PGI's successful performance of this critical national security project. It is also in the best interests of the public to have fair and equitable competition in the realm of government contracts. Allowing Janus to gain an unfair competitive advantage, over not only PGI, but also over any other contractors who may seek to bid on such projects, is a clear disservice to the public. It is in the best interests of taxpayers to

increase competitiveness of government contracts, thereby reducing costs and increasing efficiency. Finally, the public has an interest in protecting the fealty of contracts in general and advancing the legitimate development and growth of businesses. Allowing companies to protect their legitimate business interests through enforceable confidentiality and non-hiring obligations furthers the public interest.

## IV.   **CONCLUSION**

For the foregoing reasons, Plaintiff prays that this court issue a temporary restraining order enjoining Janus, directly or indirectly, and whether alone or in concert with others, including any of Janus' officers, agents, employees and/or representatives, contractors, subcontractors, teaming partners, joint venturers, affiliates, subsidiaries from:

(1)   Soliciting any business from, or initiating any further contact or communication with PGI's client, related to goods and services presently provided by PGI pursuant to the Project.

(2)   Soliciting any PGI employee, or independent contractor hired by PGI, or initiating any further contact or communication with PGI employees and contractors, for one year.

(3)   Using, disclosing, or transmitting for any purpose, including the solicitation or conducting of business with PGI's client, any and all of PGI's confidential information or trade secrets.

(4)   Destroying, erasing, deleting, or otherwise making unavailable for further proceedings related to this matter, and PGI's continued performance of the Project, any records or documents (including data or information stored in computer files or other electronic storage media) in Janus' possession or control which were obtained from PGI or which relate to any of the events alleged in this Memorandum.

A proposed Order has been filed contemporaneously herewith.

Respectfully submitted,

July 15, 2016                                      By: /s/  Daniel S. Ward

Daniel S. Ward, VSB # 45978
Ward & Ward, P.L.L.C.
2020 N Street, N.W.
Washington, DC 20036
(202) 331-8160
(202) 331-8162 (Fax)
dan@wardlawdc.com


Ryan C. Berry, VSB # 67956
Greenberg Traurig, LLP
1750 Tysons Boulevard
Suite 1000
McLean, VA  22102
Telephone: (703) 749-1369
Facsimile: (703) 714-8388
E-mail: berryr@gtlaw.com

*COUNSEL FOR PLAINTIFF*

## CERTIFICATE OF SERVICE

I hereby certify that on July 15, 2016, I served copies of the foregoing as follows:

**Via email to:**
Mr. Alan Weakley
President and COO
Janus Global Operations, LLC
2229 Old Hwy 95
Lenoir City, TN 37771
Alan.weakley@jansgo.com

**Via email to:**
Ms. Jennifer Matchett
Director of Contracts
Janus Global Operations, LLC
2229 Old Hwy 95
Lenoir City, TN 37771
Jennifer.Matchett@jansgo.com

**Via first class mail, postage prepaid to:**
Janus Global Operations, LLC
c/o its Registered Agent
Corporation Service Company
2711 Centerville Road, Suite 400
Wilmington, DE 19808

*/s/ Daniel S. Ward*

Daniel S. Ward (VSB 45978)

**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION**

| | |
|---|---|
| **PATRIOT GROUP INTERNATIONAL, INC.**<br><br>    Plaintiff,<br><br>    v.<br><br>**JANUS GLOBAL OPERATIONS LLC,**<br>**f/k/a STERLING GLOBAL OPERATIONS,**<br>**INC., f/k/a EOD TECHNOLOGY, INC.**<br><br>    Defendant. | Civil Action Number: _____ |

## [PROPOSED] ORDER

Upon consideration of Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction, and any response thereto; and

It appearing to the Court that Plaintiff is likely to succeed on the merits of their claims; and

It appearing to the Court that the Plaintiff is likely to suffer irreparable harm in the absence of an immediate temporary restraining order; and

It appearing to the Court that the balance of equities is in favor of the Plaintiff, as Defendant is unlikely to sustain any undue injury if this temporary restraining order is granted; and

It appearing to the Court that the entry of a temporary restraining order is in the public interest; it is hereby

ORDERED, that Plaintiff's Motion is GRANTED, and it is further

ORDERED that Defendant, Janus Global Operations LLC ("Janus"), shall immediately refrain from directly or indirectly, and whether alone or in concert with others, including any of Janus' officers, agents, employees and/or representatives, contractors, subcontractors, teaming partners, joint-venturers, affiliates, subsidiaries from:

(1)     Soliciting any business from, or initiating any further contact or communication with PGI's client, related to goods and services presently provided by PGI pursuant to the Project.

(2)     Soliciting any PGI employee, or independent contractor hired by PGI, or initiating any further contact or communication with PGI employees and contractors, for one year.

(3)     Using, disclosing, or transmitting for any purpose, including the solicitation or conducting of business with PGI's client, any and all of PGI's confidential information or trade secrets.

(4)     Destroying, erasing, deleting, or otherwise making unavailable for further proceedings related to this matter, and PGI's continued performance of the Project, any records or documents (including data or information stored in computer files or other electronic storage media) in Janus' possession or control which were obtained from PGI or which relate to any of the events alleged.

ENTERED this _____ day of July, 2016.

_____
Judge
UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF
VIRGINIA

2

Copies to:

Daniel S. Ward, VSB # 45978
Ward & Ward, P.L.L.C.
2020 N Street, N.W.
Washington, DC 20036
(202) 331-8160
(202) 331-8162 (Fax)
dan@wardlawdc.com


Ryan C. Berry, VSB # 67956
Greenberg Traurig, LLP
1750 Tysons Boulevard
Suite 1000
McLean, VA  22102
 (703) 749-1369
 (703) 714-8388
berryr@gtlaw.com

*COUNSEL FOR PLAINTIFF*