# EXHIBIT C

# AFFIDAVIT OF WALTER LEE GIBSON

I, WALTER LEE GIBSON, affirm as follows:

1. I am over the age of 18, and I am a resident of Missouri. I am an employee of Patriot Group International ("PGI") with the title of Project Manager. As such I have personal knowledge of the matters stated in this affidavit, and if called as a witness I would competently testify thereto.

2. PGI has a Master Subcontract Agreement ("MSA") with EOD Technology, Inc., now Janus Global Operations, LLC ("Janus") under the terms of which PGI, as the Prime Contractor ("Prime") would retain Janus to perform certain professional services as a subcontractor in furtherance of the performance of a contract ("the Project") with the U.S. Government.

3. On or about May 24, 2016, I attended a two-week training course with PGI employees, independent contractors hired by PGI, and Janus employee(s). This training course is an annual requirement for personnel that serve on the project. At the completion of the training I had assumed duties as the Program Manager and as such, I addressed personnel in a meeting to dispel negative rumors concerning the program. Randy Leonard, a Janus employee who was the Training Manager on the Project, was in attendance at that meeting. After I made my comments, Randy Leonard ("Leonard")(the Janus Employee) announced that there was no way that PGI will win the Project when the contract goes up for rebid.

4. During that same May 24, 2016 meeting, Leonard drew a timeline on the whiteboard outlining how and why PGI was going to lose the Project, and how Janus would win it. Leonard claimed that USG representatives involved with the Project

provided him with this information and informed him that there would be a transition period with the contractors being replaced in phases to prevent them from banding together.

5. During that same May 24, 2016 meeting, Leonard told those in attendance that Janus was going to start running training sessions concurrently with project training sessions so that Janus could build up their numbers in an effort to bid on the Project. Leonard invited those attending the meeting to join the Janus training sessions.

6. Pursuant to the terms of the MSA, Leonard and other Janus employees have intimate knowledge of the training plan developed for the Project by PGI. Leonard has stated to me on a number of occasions that he sent that training plan, and revisions thereto, directly to USG representatives involved with the Project so that the requirements and methodologies included therein could be incorporated into the Request for Proposal ("RFP") that the Government Client would use for rebidding the Project. Such communications by Leonard directly to the Government Client are in direct violation of the terms of the MSA.

7. Leonard admitted to me on a number of occasions that he had discussions with USG representatives involved with the Project in which those USG representatives informed Leonard that demonstrating the training would be a part of the bidding process, thus giving Janus an unfair competitive advantage over PGI, and any other bidders on the Project, because Janus is the only company (other than PGI) with knowledge of the advanced training methods currently used by PGI. Again, these statements by Leonard are admissions of direct and material violations of the MSA by Janus.

8. On or about May 26, 2016, Leonard told me that Janus was actively recruiting Kenny Masters ("Masters"), a PGI employee who is integral to the success of the Project. After hearing this from Leonard, I talked to Masters about his interactions with Leonard. Masters informed me that Leonard had spoken to him about working for Janus, and further informed me that Leonard had asked Masters for his personal email address. Again, Leonard's efforts to recruit a PGI employee are a direct and material violation of the MSA by Janus.

9. In or about the June 3-7, 2016 time period, Leonard came with me to the training office. At that time, Leonard asked me if I would be comfortable with him getting letters of intent from the contractors saying that they would work for Janus when the Project goes up for rebid. I told Leonard that I was not comfortable with that.

10. On a number of occasions, Leonard told me that Janus wanted to name me as the Project Manager on their bid for the Project. Again, Leonard's efforts to recruit me, a PGI employee, are a direct and material violation of the MSA by Janus.

11. In or about June 2016, one of the contractors working on the Project approached me with concerns that Janus had given him certificates for trainings that he had not completed. Not only do the certificates indicate that Janus conducted specialized trainings that never took place, the total hours of the combined trainings as indicated on the certificates are well beyond the time spent in the actual trainings that took place. In speaking with numerous members of the PGI corporate management team, I learned that these fictitious certifications were never authorized by PGI.

12. In June 2016, Leonard told me to keep Greg Craddock, CEO of PGI, and Christy Beach, PGI VP of Contracts and Business Manager of the Project, out of the loop on

communications regarding the Project. Again, these statements by Leonard are admissions of direct and material violations of the MSA by Janus.

13. On or about July 1, 2016, Leonard called me and stated that one of USG representatives involved with the Project informed Leonard that the USG representative is waiting for Leonard to provide the client with a copy of an updated training plan so the Government Client can use that updated training plan to draft the RFP. This is yet another admission of direct and material violations of the MSA by Janus.

14. In that same July 1, 2016 conversation, Leonard informed me that, depending on the requirements that are ultimately written into the RFP, Janus would like to propose me as Project Manager in their bid for the Project. Again, these statements by Leonard are admissions of direct and material violations of the MSA by Janus.

15. In that same July 1, 2016 conversation, Leonard requested that I provide him with sensitive and confidential PGI pricing and compensation information. Again, these statements by Leonard are admissions of direct and material violations of the MSA by Janus.

16. In that same July 1, 2016 conversation, Leonard informed me that the RFP would probably come out between July 15, 2016, and August 15, 2016.

17. In that same July 1, 2016 conversation, Leonard told me that there was going to be a requirement for a Professional Project Manager with a certain number of years experience running a program with a annual budget of at least $25,000,000. Leonard stated that he received this information from a USG representative with supervisory authority over the Project. Again, these statements by Leonard are admissions of direct and material violations of the MSA by Janus.

18. On or about July 8, 2016 I had a telephone call with Leonard in which he again recruited me to work for Janus on the Project.

19. During that July 8, 2016 call, Leonard repeatedly said that I will "have to make a choice" between PGI and Janus.

20. During that July 8, 2016 call, Leonard assured me that if Janus was awarded the Project, Janus would hire me as Project Manager ("PM") or Deputy Project Manager ("DPM")

21. During that July 8, 2016 call, Leonard informed me that Janus is in negotiations with Osen-Hunter Group, LLC ("Osen-Hunter") to enter into a teaming agreement to bid on the Project.

22. During that July 8, 2016 call, Leonard said that Janus' plan was to have Osen-Hunter, not Janus, hire Kenneth Masters to work on the project in order to evade Janus' non-solicitation obligations to PGI.

23. During that July 8, 2016 call, Leonard repeatedly made representations that he was receiving inside information from USG representatives involved with the Project about the Client's plan to issue a RFP.

24. During that July 8, 2016 call, Leonard again requested that I provide Janus with information regarding PGI's current pricing information and pay rates.

25. During that July 8, 2016 call, I expressed concerns to Leonard about his requests for the confidential pricing and pay information and asked if it was "shady" to provide him that information.

26. During that July 8, 2016 call, Leonard responded to this question by saying that "It would be shady if I did not know for certain that I was getting the program" and that "it's really not" shady to give Janus the pricing information in the current situation.

27. During that July 8, 2016 call, Leonard stated to Gibson that he may disclose sensitive PGI pricing information to PGI's competitors.

28. On or about July 12, 2016, I had a conversation with Leonard with a USG representative with supervisory authority over the Project. In that conversation, both Leonard and the USG Employee suggested that I resign from PGI and revert to 1099 contractor status on the Project in an effort to circumvent my non-compete agreement with PGI.

29. In that same July 12, 2016 conversation, that same USG representative with supervisory authority over the Project stated that, while it was "possible" that PGI could win the re-bid of the contract (an assertion that brought uproarious laughter from Leonard), "It would be like me kicking Brock Lesnar's ass." After saying that, the USG representative with supervisory authority over the Project said "do not say that to Craddock."

I solemnly affirm under penalties of perjury under the laws of the United States of America that the foregoing Affidavit is true and correct.

Executed this 14th day of July 2016, at _____, _____.

_____
WALTER LEE GIBSON

6